COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL NO. 2581CV00491

VALLEY EYE PHYSICIANS AND )
SURGEONS P.C. and  GISELA VELEZ )
M.D., LLC )
 )
          Plaintiffs, )
 )
      v. )
 )
MODERNIZING MEDICINE BILLING )
SERVICES, LLC )
 )
          Defendant. )
 )

**COMPLAINT AND JURY DEMAND**

### Preliminary Statement

The Plaintiffs bring this Complaint to recover damages and rescission of contract from the Defendant, Modernizing Medicine Billing Services, LLC ("**ModMed**") due to ModMed's misrepresentations as set forth below as well as to recover damages for ModMed's breach of fiduciary duty; unfair and deceptive acts and practices in violation of M.G.L. c. 93A; interference with advantageous business relations; negligence; and for declaratory judgment that the parties' contract is void for failure of consideration.

### Parties

1.    The Plaintiff, Valley Eye Physicians and Surgeons P.C. ("**Valley Eye**") is a corporation engaged in the practice of medicine with an office and usual place of business at 190 Groton Road, Ayer, Middlesex County, Massachusetts.

2.    The Plaintiff, Gisela Velez M.D., LLC ("**Velez LLC**") is a limited liability company engaged in an ophthalmology practice with an office and usual place of businesses at

190 Groton Road, Suite 190, Ayer, Middlesex County, Massachusetts. Valley Eye and Velez LLC are hereinafter collectively referred to as the "Plaintiffs".

3.    The Defendant, ModMed, also known as MMBS, is a California Limited Liability Company with primary offices and a usual place of business at 4850 T-Rex Avenue, Suite 200, Boca Raton, Florida. ModMed is not registered with the Massachusetts Secretary of State as a company doing business in Massachusetts despite the fact that it does so conduct business.

**Jurisdiction and Venue**

4.    This Court has personal jurisdiction over ModMed, as a foreign company doing business even though not properly registered in Massachusetts. This Court also has personal jurisdiction over ModMed pursuant to M.G.L. c. 223A, the Massachusetts Long Arm Statute, due to ModMed's contacts with the Commonwealth of Massachusetts concerning the subject matter and claims in this Complaint.

5.    Venue is proper in Middlesex County for the claims in this Complaint, as the Plaintiffs have usual places of business in Middlesex County pursuant to M.G.L. c. 223, § 1.

**Background Facts**

6.    ModMed is in the business of providing billing services to medical practices. Generally, a medical customer of ModMed is a doctor who provides medical services; the patients submit billing and third-party payor information; the doctor's office then complete claims presented in the bill in accordance with the requirements of the third-party insurance company payor; and the doctor's office supplies such information to ModMed, which then submits the billings to the appropriate insurance company or other payor who is responsible for payment of the medical services rendered in question.

2

7.    Most insurers and other third-party payors have "timely filing" requirements for submission of medical billings and will not pay bills that are not submitted within the required timely filing window, e.g. within sixty or ninety days after the treatment in question.

8.    ModMed was fully aware of the Plaintiffs' timely filing requirements prior to signing a contract with Plaintiffs.

9.    ModMed specifically represented to Plaintiffs, in contract discussions shortly before the contract was fully signed on February 28, 2022, that ModMed had sufficient staffing and expertise to comply with all third party payor requirements, and that Plaintiffs could entrust 100% of the Plaintiffs' billings to ModMed for submission and collection.

10.    ModMed further stated and represented to the Plaintiffs that ModMed had sufficient staffing and oversight, sufficient knowledge of all timely filing requirements, extensive expertise in medical billing and sufficient knowledge of the Plaintiffs' medical practices to timely process and collect the Plaintiffs' accounts.  ModMed was aware, during contract discussions, that the Plaintiffs' billing person had left the Plaintiffs' employ, was aware that Plaintiffs were in dire need of billing support and made the foregoing representations to induce Plaintiffs to entrust 100% of their billing to ModMed.

11.    Based upon ModMed's materially false misrepresentations that it was fully committed to enact those said representations and assurances, the Plaintiffs agreed to sign up for ModMed's services.

12.    ModMed's representations to the Plaintiffs also included a specific proposal which diagrammed how ModMed would submit claims, how its clients would manage rejections and denials, in a successful effort to induce the Plaintiffs to rely on ModMed for all billing

3

matters. See the "Boost Proposal" submitted to Valley Eye Physicians, a copy of which is attached hereto and incorporated herein by reference as Exhibit 1.

13.    As a result, on or about February 28, 2022, the Plaintiffs entered into the Boost Proposal agreement with ModMed, referred to as a "Revenue Cycle Management Agreement," (which is hereinafter referred to as the **"Boost"** contract), with services to commence on April 25, 2022.

14.    The said "Boost" contract details ModMed's responsibilities to the Plaintiffs. A true and accurate copy of the Plaintiffs' "Boost" contract with ModMed is attached hereto and specifically incorporated herein by reference as Exhibit 2.

15.    The "Boost" contract required the Plaintiffs to submit 100% of their patient billings to ModMed and to thereby make ModMed the sole and exclusive billing service of the Plaintiffs.

16.    The "Boost" contract further provided that Plaintiffs could not cancel the contract until the first anniversary, i.e. Plaintiffs were married to ModMed for a minimum of one full year, from April 25, 2022 until at least April 25, 2023, with a "Monthly Minimum RCM Fee" starting at $3,000 and increasing to $5,500 per month by the fourth month of the contract.

17.    As a result, the Plaintiffs were dependent on ModMed for oversight and for collection of the revenue generated by and for the Plaintiffs, with little ability to terminate the relationship or to hire anyone else, until at least the first anniversary of the contract.

18.    The "Boost" contract also included a link to ModMed's "Standard Terms and Conditions," a boilerplate "click" form written by ModMed.   The Standard Terms and Conditions contain the following numerous unreasonable and unfair boilerplate provisions:

     a.    limitations of liability for claims against ModMed;

4

b.  disclaimers of consequential damages and other damages;

c.  exclusive California venue provisions for any suit to "adjudicate any dispute rising out of or relating to the [contract] Documents."

d.  a provision that all "transaction documents" are "governed by and construed in accordance with the laws of the State of California without regard to its conflict of law provisions."

A true and accurate copy of the ModMed Standard Terms and Conditions document is attached hereto and specifically incorporated herein by reference as Exhibit 3.

19.    Dr. Velez is educated as a practicing physician and retina specialist, but more so as a medical services provider than from a commercial contracting function.

20.    The Plaintiffs' services to their patients were primarily in Massachusetts and the invoices to patients were generated and issued in Massachusetts. The vast majority of the third-party payors, to whom the Plaintiffs' bills invoices were to be submitted, were located in Massachusetts as were the vast majority of Plaintiffs' patients. As such, ModMed was obligated to submit Plaintiffs' billings to first party and third party payors located in Massachusetts.

21.    The Plaintiffs' transactions and dealings with ModMed were between Plaintiffs in Massachusetts and ModMed in Florida.

22.    There were no significant contacts of the parties with the State of California in the dealings between the Plaintiffs and ModMed which are the subject of this Complaint.

23.    It would be against public policy and patently unfair to require the Plaintiffs to travel to California to resolve its claims against ModMed (which has its headquarters in Florida) as the Plaintiffs would be prejudiced in the event that Plaintiffs sought to pursue their rights

against ModMed. Likewise, Plaintiffs have insufficient contacts with California to be present and/or doing business in California.

### ModMed's Failure to Perform its Obligations

24.    ModMed commenced its medical billing services on behalf of the Plaintiffs on April 25, 2022.

25.    ModMed's services were a disaster. As discussed below, ModMed was negligent and cost the Plaintiffs millions of dollars in lost billings and billings that were not properly submitted to the subject payors. Virtually none of ModMed's representations were backed up by ModMed.

26.    The Plaintiffs' collections in 2022 averaged approximately $600,000 per month, or $7.2 million annually, on billings of nearly $2 million per month, or $24 million per year. While part of that discrepancy is due to third-party payors' ability to adjust charges downwards, by way of comparison, when Plaintiffs had one part time in-house billing coordinator, the Plaintiffs collected over $57,000 per month more than ModMed, at much less cost. Based on ModMed's misrepresentations as to its resources, expertise and experience, its collections for the Plaintiffs were a complete failure.

27.    ModMed repeatedly failed to timely submit invoices to third party payors in accordance with timely filing requirements.

28.    The Plaintiffs were able to obtain timely filing extensions from several third-party payors, but ModMed still failed to submit billings prior to the expiration of the extended timely filing date, including over $1,300,000 of submissions that ModMed failed to submit to the Plaintiffs' third-party payors in accordance with timely filing requirements.

6

29.    ModMed further (i) failed to follow up rejected invoices, many of which were easily correctible by re-coding or other information and (ii) failed to even tell Plaintiffs of the rejections. As a result, Plaintiffs did not know that the invoices had been rejected until after the time for re-filing had expired.

30.    ModMed had another category of billings which ModMed referred to as "practice held" billings, which were held aside for further information. However, ModMed did not inform or notify the Plaintiffs of the "practice held" billings. As a result, since the Plaintiffs did not know about the practice held billings, Plaintiffs could not make corrections necessary to make timely submissions and those billings were never submitted to the appropriate third party payor.

31.    ModMed also alienated many of the Plaintiffs' patients who did not receive appropriate or proper billing services. When ModMed failed to collect payments from insurers, it often sent large invoices directly to the patient in question even though the claim was covered by insurance. Patients often received, from ModMed, demands for payment of a large bill for services that should have been collected by ModMed from the insurer. As a result, the Plaintiffs had many very unhappy patients due to ModMed's failed billings, who went elsewhere and who left highly dissatisfied reviews of the Plaintiffs' practices and services.

### COUNT I
(Fraud in the Inducement/Misrepresentation)

32.    The Plaintiffs repeat, re-aver, and the allegations in Paragraphs 1 through 31 above, as if expressly rewritten and set forth herein.

33.    ModMed knowingly misrepresented to Plaintiffs, in discussions between representatives of Plaintiffs and ModMed representatives, in early 2022, that ModMed had extensive resources and expertise to handle the third party payor collections and other billing collections.

7

34.    ModMed's misrepresentations were made to the Plaintiffs to induce the Plaintiffs to enter into a contract with ModMed, and to induce Plaintiffs to use ModMed as the sole collection agent for the Plaintiffs for a minimum engagement of 12 months.

35.    The Plaintiffs relied on the aforesaid misrepresentations and entered into the contract with ModMed and suffered damages when ModMed failed to properly administer the contract requirements that ModMed competently and timely collect Plaintiffs' receivables.

36.    In addition to rescission of the Plaintiffs' contract with ModMed, Plaintiff also incurred substantial damages caused by ModMed by virtue of its failure to live up to its representations.  The Plaintiffs did not become aware that the ModMed representations were untrue until after ModMed had started its work for Plaintiffs on April 25, 2022.

## COUNT II
### (Breach of Fiduciary Duty)

37.    The Plaintiffs repeat, re-aver, and re-allege the allegation in Paragraphs 1 through 36 above, as if expressly rewritten and set forth herein.

38.    Based upon and in reliance upon ModMed's representations, the Plaintiffs agreed that ModMed would be the sole and only collection agent for the Plaintiffs' medical practices, the Plaintiffs agreed to pay a minimum monthly fee of up to $5,500.00 per month and Plaintiffs hired ModMed for a minimum of twelve (12) months.

39.    As a result, ModMed caused the Plaintiffs to become totally dependent on ModMed and highly vulnerable to ModMed's failures to properly provide the billing services that were contemplated therein.

40.    In doing so, ModMed created a fiduciary duty towards the Plaintiffs.

8

41.     The Plaintiffs were substantially damaged by ModMed's breach of said fiduciary duty.

### COUNT III
(Violations of M.G.L. c. 93A§11)

42.     The Plaintiffs reaver, reallege and incorporate herein by reference each of the allegation in Paragraphs 1 through 41 above, as if expressly rewritten and set forth herein.

43.     ModMed is engaged in a trade or commerce in connection with its relationship with the Plaintiffs.

44.     The Plaintiffs were engaged in a trade or commerce in its dealings with ModMed.

45.     ModMed employed the following unfair and deceptive acts and practices against the Plaintiffs, each of which is separately and cumulatively alleged as unfair and deceptive are in violation of M.G.L. c. 93A:

    a.  Misrepresenting that ModMed has sufficient expertise and personnel to collect the Plaintiffs' billings;

    b.  By virtue of ModMed's requirements, forcing the Plaintiffs to accept that ModMed was to be the sole billing agent for the Plaintiffs for at least a year, with substantial minimum fees;

    c.  Violating ModMed's fiduciary duties to properly collect the Plaintiffs' billing receivables and rendered the Plaintiffs particularly vulnerable to such failure; and

    d.  Causing Plaintiffs to continue to use ModMed, notwithstanding massive failures by ModMed, by enforcing the minimum fees provisions and the minimum term provisions in the parties contract.

46.     ModMed's unfair and deceptive acts and practices caused damage primarily and substantially in Massachusetts.

47.    ModMed's unfair and deceptive acts and practices were willful, knowing, and intentional.

48.    The Plaintiffs have suffered damages as a result of ModMed's unfair and deceptive acts and practices.

### COUNT IV
(Interference with the Plaintiffs' Advantageous Relationships with its Patients)

49.    The Plaintiffs repeat, re-aver, and re-allege the allegations in Paragraphs 1 through 48 above, as if expressly rewritten and set forth herein.

50.    ModMed was fully aware of the Plaintiffs' advantageous relationship with the Plaintiffs' patients.

51.    As result of ModMed's reckless conduct, numerous patients left the Plaintiffs' practice and ceased to utilize the Plaintiffs' services.  Additionally, by virtue of ModMed's conduct, several patients posted negative reviews on social media, which also caused the Plaintiffs to lose patients.

52.    The Plaintiffs were damaged by the loss of clients caused by ModMed's knowing interference with said advantageous business relationships.

### COUNT V
(Negligence)

53.    The Plaintiffs repeat, re-aver, and re-allege the allegation in Paragraphs 1 through 52 above, as if expressly rewritten and set forth herein.

54.    The conduct of ModMed, as detailed above, was negligent.

55.    ModMed's negligence caused substantial damages to the Plaintiffs, as stated above.

## COUNT VI
### (Declaratory Judgment)

56.     The Plaintiffs repeat, re-aver, and re-allege the allegation in Paragraphs 1 through 55 above, as if expressly rewritten and set forth herein.

57.     The Plaintiffs seek a declaratory judgment that there was a failure of consideration, and that the agreements, Exhibits 2 and 3 hereto, between ModMed and the Plaintiffs are therefore null and void.

WHEREFORE, the Plaintiffs, Valley Eye Physicians and Surgeons, PC and Gisela Velez M.D. LLC, respectfully request this Court to enter the following Judgment against Defendant, Modernizing Medicine Billing Services, LLC as follows:

1.     Judgment in favor of the Plaintiffs against Defendant, Modernizing Medicine Billing Services, LLC, under Count I, for fraud in the inducement and recission of the Contract and for such damages as the fact finder determines to be just and proper.

2.     Judgment in favor of the Plaintiffs  against the Defendant, Modernizing Medicine Billing Services, LLC, under Count II for breach of fiduciary duty and for damages in such amount as the fact finder determines to be just and proper.

3.     Judgment in favor of the Plaintiffs against Defendant, Modernizing Medicine Billing Services, LLC under Count III of the Complaint, for violations of M.G.L. c 93A in such an amount as the fact finder shall determine be just and proper, plus attorneys' fees, and for double or treble damages for said Defendant's willful and knowing violations of M.G.L. c 93A, §11.

4.     Judgment in favor of the Plaintiffs and against Modernizing Medicine Billing Services, LLC under Count IV of the Complaint for interference with the Plaintiffs' advantageous

11

business contractual relations with its patients in such amount as the fact finder shall determine to be just and proper.

5.    Judgment in favor of the Plaintiffs under Count V of the Complaint against Modernizing Medicine Billing Services, LLC for negligence, in such amount as the fact finder shall determine to be just and proper, for the negligence of Defendant Modernizing Medicine Billing Services, LLC.

6.    Declaratory Judgment in favor of the Plaintiffs under Count VI of the Complaint, declaring that the contract between Plaintiffs and Modernizing Medicine Billing Services, LLC is void due to failure of consideration.

7.    For such other and further relief as the Court and/or fact finder determines to be just and proper.

## JURY CLAIM

The Defendants hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

VALLEY EYE PHYSICIANS AND
SURGEONS, PC  and
GISELA VELEZ M.D., LLC and


By their Attorneys
RIEMER & BRAUNSTEIN LLP


Dated:  February 26, 2025

*/s/ Joseph R. Valle, Jr.*
Joseph R. Valle, Jr., BBO No. 550291
Riemer & Braunstein LLP
100 Cambridge Street, 22nd Floor
Boston, Massachusetts 02114
jvalle@riemerlaw.com
(617) 880-3429

3880930.5

# Exhibit 1



# The ModMed BOOST Process







# Responsibility Matrix



# Lockbox Services







**Don't Just Take Our Word For It**



**Sometimes it's just better to let others do the talking for us:**

❝ We have full visibility into our financial data. ❞

❝ The move to the all-in-one suite was a great decision for the clinical and financial health of my practice. ❞

❝ We quickly saw improvement in office and billing operations. ❞

❝ We have consistently remained better than the benchmark for denials and rejections, and I would say cash flow has improved. ❞

❝ The average turnaround time for payments is 22 days, and our denial rate is only 2%. ❞

❝ It's really rewarding to watch our cashflow grow. ❞

❝ Our dedicated client manager is so knowledgeable and only a phone call away. ❞

❝ I trust that Modernizing Medicine is looking out for the financial health of my practice. ❞

modmed® BOOST

# What you told us



- Total Collections: $3,339,226
- Total Claims: 9539
- Collection per Claim: $350
- Based on 2021 Metrics
- 3 MD

6

# Pricing Summary

MODERNIZING MEDICINE

Monthly Fee: **3.65% of Net Collections**
Biologics Carve-out: $6 per Jcode

You pay the greater of the two, not both!

Monthly Minimum: **$5500**
3-Month Ramp: $3000, $4000, $5000

## Add on Providers:
$1250 For a Full Time MD/Ext.
$1250 For a Part Time MD/Ext.
*Cost increase to the minimum if you were to add on a provider
during your contract term above the current number of providers. No changes to the percentage.

Startup Fee: **$3,000** (50% off if completed by 02/28/2022)

Lockbox: ~$250 - $400/month (We connect with Multiple Banks)
ModMed Pay Discount: Rate Reduced by 0.50%
Patient Statements: Included

Exhibit 2

**REVENUE CYCLE MANAGEMENT AGREEMENT**

**THIS REVENUE CYCLE MANAGEMENT AGREEMENT** (this "**RCM Agreement**") is entered into on the date last signed below ("**Effective Date**") by Modernizing Medicine Billing Services, LLC, a California limited liability company with offices located at 4850 T-Rex Avenue, Suite 200, Boca Raton, Florida 33431 ("**MMBS**"), and Valley Eye Physicians and Surgeons P.C. with offices located at the address set forth on the signature page hereto ("**Client**"). MMBS and Client may be referred to herein each individually as a "**Party**" and together as the "**Parties**".

1.      **Terms and Conditions**. Additional terms and conditions of this RCM Agreement are set forth in the RCM Standard Terms and Conditions (the "**Terms and Conditions**"), located at https://www.modmed.com/tc_rcm_6-1-21/ (the "**Terms Site**") on the Effective Date, which Terms and Conditions are fully incorporated into and made a part of this RCM Agreement by this reference as if fully set forth herein. A copy of the Terms and Conditions applicable to this Agreement may not be available after the Effective Date at the Terms Site, in which case Client may request that MMBS provide Client with a copy of the Terms and Conditions. This RCM Agreement and the Terms and Conditions are referred to collectively as this "**Agreement**." All capitalized terms used in this RCM Agreement and not defined herein have the meanings set forth in the Terms and Conditions. By signing below Client hereby acknowledges Client's receipt of the Terms and Conditions.

2.      **RCM Services**. Commencing on the RCM Services Commencement Date, MMBS shall provide the RCM Services set forth in Schedule "A" hereto (the "**RCM Services**") to Client on the terms and conditions set forth in this Agreement. Client hereby appoints MMBS as Client's exclusive (except for collection agencies pursuing Delinquent Accounts) billing and collection agent, and hereby specifically authorizes MMBS to provide the RCM Services.

3.      **Fees**. Client agrees to pay MMBS the fees set forth on Schedule "B" hereto (collectively, the "**Fees**") in accordance with the terms of this Agreement.

4.      **Term**. Unless terminated earlier as set forth in the Terms and Conditions, the initial term (the "**Initial Term**") of this Agreement shall commence on the Effective Date and end on the one (1) year anniversary of the RCM Services Commencement Date. Subject to the terms and conditions of this Agreement, the term of this Agreement shall automatically renew immediately following the expiration, as applicable, of the Initial Term or applicable Renewal Term (as defined below) for an additional one (1) year term (each such additional term, a "**Renewal Term**" and, collectively, with the Initial Term, the "**Term**"). Notwithstanding the foregoing, this Agreement shall be terminable by either Party by providing at least ninety (90) days written notice to the other Party prior to the end of the Initial Term or then current Renewal Term and such termination shall be effective on the last day of the Initial Term (if such notice was provided at least ninety (90) days prior to the end of the Initial Term) or the last day of the then current Renewal Term.

**[Signature Page Follows]**

Acknowledged and Agreed:

**CLIENT**

**By:**

**Print Name:**

**Title:**

**Date:**

   **Notice.** All notices to Client shall be sent to:

190 Groton Rd. Ste 240
Ayer, Massachusetts 01432
Attention: Gisela Velez, MD
E-mail: velezgisela@gmail.com


**MODERNIZING MEDICINE BILLING SERVICES, LLC**

**By:**

**Print Name:**

**Title:**

**Date:**

[Signature page to RCM Agreement]

2

**SCHEDULE "A"**

RCM Services Commencement Date:  April 18, 2022

RCM Services are as follows:

1. The billing and collection services MMBS deems appropriate for Client's circumstances, including, without limitation, the activities identified on **Schedule "A-1"** as being the responsibility of MMBS.

2. Monthly telephonic meeting between a representative of MMBS and Client (subject to mutual agreement of time and date) to discuss the RCM Services.

3. Access to monthly reports of certain key indicators (e.g., provider charges, adjustments, collections, accounts receivable, encounter detail).

For the avoidance of doubt, Client shall be responsible for those activities identified on **Schedule "A-1"** as being the responsibility of Client and such activities shall not constitute RCM Services.

3

## SCHEDULE "B"

### A.    RCM Fees.

As compensation for the RCM Services provided by MMBS pursuant to this Agreement, each month Client shall pay MMBS a fee (the "**RCM Fee**") equal to the greater of (x) 3.65% of Net Collections (as defined below) for the prior month plus (y) Six Dollars ($6.00) per J-Code Transaction or (ii) the Monthly Minimum RCM Fee (as defined below).

"**Net Collections**" shall mean the total sum of all monies collected, directly or indirectly, by or through MMBS (or by or through third parties contracted by MMBS) for all services and/or items rendered or supplied by Client or its Providers, net of all voluntary or involuntary refunds and recoupments to any patient or third-party Payer as a result of overpayments, erroneous payments or invalid checks; *provided, however,* that Net Collections: (i) shall not be reduced on account of any garnishment; (ii) shall not be reduced by, and MMBS shall not be responsible for, any recoupment or overpayments that result from, directly or indirectly, Coding Activities and (iii) shall not include any monies collected by Client for products or procedures for which (x) the Patient pays for the products or procedures entirely out-of-pocket and (y) MMBS performs no billing or collection services with respect thereto; and (iv) shall not include any monies collected, directly or indirectly, by or through MMBS (or by or through third parties contracted by MMBS) for the drug/injectable charges for the J-Code Transactions.

"**J-Code Transactions**" shall mean each charged processed by MMBS (or by or through third parties contracted by MMBS) for the following specific J-Codes: J0178, J2778, J3301, J7312 and J7351, along with any other specific J-Codes mutually agreed to in writing by MMBS and Client.

The "**Monthly Minimum RCM Fee**" shall initially be (i) Three Thousand Dollars ($3,000.00) (prorated for any partial month of RCM Services) for the first month of the Initial Term following the RCM Services Commencement Date; (ii) Four Thousand Dollars ($4,000.00) (prorated for any partial month of RCM Services) for the second month of the Initial Term following the RCM Services Commencement Date; (iii) Five Thousand Dollars ($5,000.00) (prorated for any partial month of RCM Services) for the third month of the Initial Term following the RCM Services Commencement Date ((i) (ii) and (iii) together, the "**Ramp Up Period**"); and (iv) Five Thousand Five Hundred Dollars ($5,500.00) (prorated for any partial month of RCM Services) per month thereafter. The initial Monthly Minimum RCM Fee is based on the Client having three (3) Physicians on the RCM Services Commencement Date.  If Client requests MMBS to set up any additional Physicians or Physician Extenders for RCM Services or Client otherwise adds any additional Physicians or Physician Extenders during the Term, the Monthly Minimum RCM Fee shall be increased by the following additional amounts:

　　　　(i)    If the Client adds any additional Physicians, One Thousand Two Hundred and Fifty Dollars ($1,250.00) per Physician.

　　　　(ii)    If the Client adds any additional Physician Extenders, One Thousand Two Hundred and Fifty Dollars ($1,250.00) per Physician Extender.

### B.    Billing Implementation Fee.

| Description | Billing Implementation Fee[1] |
|---|---|
|  |  |

| | |
|---|---|
| Subject to the terms and conditions of this Agreement, MMBS shall provide certain billing set up services as determined by MMBS, which may include, without limitation, billing start-up activities and other matters. | $3,000.00 |
| Discount | [$1,500.00] |
| **Net Billing Implementation Fee** | **$1,500.00** |

**C.      Other.**

| |
|---|
| Notwithstanding the foregoing, this RCM Agreement shall not be effective if signed by Client after February 28, 2022. |

**D.      Amount Due at Signing.**[1]  The total amount due upon Client's execution of this RCM Agreement is One Thousand Five Hundred Dollars ($1,500.00).

[Remainder of page left intentionally blank]

---

[1] Does not include any Taxes that may apply.  Any such Taxes are the responsibility of Client.

| | | | | Responsible Party | |
|---|---|---|---|---|---|
| | | | Description | MMBS* | Client |
| Provider Credentialing and Enrollment | Provider Enrollment | Pre-Implementation | Aetna, Cigna) | | X |
| Provider Credentialing and Enrollment | Provider Enrollment | Pre-Implementation | Ensure Providers are enrolled using group NPI | | X |
| Provider Credentialing and Enrollment | Provider Credentialing | Pre-Implementation | Credential Providers with necessary facilities | | X |
| Provider Credentialing and Enrollment | Provider Credentialing | Pre-Implementation | Negotiate third party payer contracts | | X |
| Implementation | Onboarding | Implementation | Assign MMBS Client Manager to Client | X | |
| Implementation | Onboarding | Implementation | Set schedule for Client implementation calls | X | |
| Implementation | Onboarding | Implementation | software | X | |
| Implementation | Onboarding | Implementation | Establish escalation paths and communications matrix | X | |
| Implementation | Configuration | Implementation | Determine applicable fee schedule percentages | | X |
| Implementation | Configuration | Implementation | Setup Provider fee schedule in Practice Management | X | |
| Implementation | Configuration | Implementation | amount for third party payer contracts | | X |
| Implementation | Configuration | Implementation | options (i.e. scrub rules) | X | |
| Implementation | Configuration | Ongoing | Add and update payer fee schedules | | X |
| Implementation | Configuration | Ongoing | Add payers to FirmAdmin in Practice Management and with Trizetto | X | |
| Implementation | Configuration | Implementation | Setup scheduling templates | | X |
| Implementation | Configuration | Implementation | balances transfers, etc | X | |
| Implementation | Configuration | Implementation | Medicaid, etc. | | X |
| Implementation | Configuration | Implementation | ONSPNS or capitation | | X |
| Implementation | Configuration | Implementation | Provide EDI/ERA forms for clearinghouse on behalf of Client | X | |
| Implementation | Configuration | Implementation | Complete EDI/ERA forms for all payers | | X |
| Implementation | Configuration | Implementation | Complete EFT enrollments for all payers | | X |
| Implementation | Configuration | Implementation | Configure Practice Management to RCM standard settings | X | |
| Implementation | Configuration | Implementation | Provide MMBS with access to Client's lockbox account | | X |
| Implementation | Configuration | Implementation | Configure Patient Statements in FirmAdmin in Practice Management | X | |
| Implementation | Configuration | Implementation | elected to purchase these products from Modernizing Medicine | X | |
| Implementation | Go-Live | Implementation | Test claim submission to Clearinghouse | X | |
| Implementation | Go-Live | Implementation | Verify Patient Statement generation | X | |
| Implementation | Go-Live | Implementation | Complete go-live checklist | X | |
| Implementation | Go-Live | Implementation | Sign-off on go-live | X | X |
| Implementation | Go-Live | Implementation | practice cover letter) | | X |
| Implementation | Go-Live | Implementation | Update payer remit to address to Client's lockbox account | | X |
| Information Technology | Access | Implementation | Provide Client with remote access to pDrive or other shared drive | X | |
| Patient Access | Scheduling | Daily | Schedule patient appointments | | X |
| Patient Access | Scheduling | Daily | Manage patient schedule | | X |
| Patient Access | Registration | Daily | Pre-register patients in Practice Management | | X |
| Patient Access | Registration | Daily | Complete financial clearance on patients and calculate patient liability | | X |
| Patient Access | Registration | Daily | Management | | X |
| Patient Access | Registration | Daily | Practice Management | | X |
| Patient Access | Registration | Daily | Check patient eligibility and benefits in real-time | | X |
| Patient Access | Registration | Daily | Complete all patient information forms | | X |
| Patient Access | Registration | Daily | Obtain patient signatures on applicable documents | | X |
| Patient Access | Registration | Daily | Update patient insurance information | | X |
| Patient Access | Registration | Daily | Verify patient eligibility | X | |
| Patient Access | Registration | Daily | communicate any available finding to Client | X | |
| Patient Access | Financial Counseling | Daily | Educate patients about financial responsibilities | | X |
| Patient Access | Financial Counseling | Daily | patients | | X |
| Clinical Management | Documentation | Daily | Perform all clinical documentation for patient | | X |
| Clinical Management | Documentation | Daily | Assign correct rendering and billing provider | | X |
| Clinical Management | Documentation | Daily | Deliver any necessary CMS notices/forms to patient (e.g. ABN) | | X |
| Clinical Management | Documentation | Daily | Finalize Visit Note and provide charges to MMBS | | X |
| Clinical Management | Coding | Daily | Medical coding | | X |
| Clinical Management | Coding | Daily | Assign appropriate modifiers/resolve modifier edits | | X |
| Clinical Management | Coding | Daily | Responsible for making the coding changes in the system | | X |
| Accounts Receivables Management | Claims Processing | Daily | Configures billing edits | X | |
| Accounts Receivables Management | Claims Processing | Daily | Submit claims received from Client to clearinghouse | X | |
| Accounts Receivables Management | Claims Processing | Daily | Claim submission outside of modmedPM (Examples: VSP & EyeMed) | | X |
| Accounts Receivables Management | Claims Processing | Daily | Charge entry for services not originating from EMA visit note finalization (i.e. glasses and contacts) | | X |
| Accounts Receivables Management | Claims Processing | Daily | Monitor, segment and attempt to resolve claim billing edits where deemed appropriate by MMBS | X | |
| Accounts Receivables Management | Claims Processing | Daily | Process claim rejections as deemed appropriate by MMBS | X | |
| Accounts Receivables Management | Claims Processing | Daily | Re-bill late charges to payers as deemed appropriate by MMBS | X | |
| Accounts Receivables Management | Claims Processing | Daily | Process manual claim adjustments | X | |
| Accounts Receivables Management | Claims Processing | Daily | Submit paper claims | X | |
| Accounts Receivables Management | Third Party Payers | Ongoing | Notify MMBS of any contractual changes with third party payers | | X |
| Accounts Receivables Management | Accounts Receivables | Daily | Perform commercially reasonable follow-up services on outstanding claims | X | |
| Accounts Receivables Management | Accounts Receivables | Daily | Resubmit corrected claims as deemed appropriate by MMBS | X | |
| Accounts Receivables Management | Accounts Receivables | Monthly | Write-off or adjust uncollectible accounts as per RCM write-off policies | X | |
| Accounts Receivables Management | Denial Management | Daily | Categorize and analyze denials based on Claim Adjustment Reason Codes (CARCs) | X | |
| Accounts Receivables Management | Denial Management | Daily | Process and submit appeals on denials where deemed appropriate by MMBS | X | |
| Accounts Receivables Management | Denial Management | Daily | Follow-up with payer on appealed claims as deemed appropriate by MMBS | X | |
| Accounts Receivables Management | Denial Management | Daily | Communicate denial trends to Client | X | |
| Accounts Receivables Management | Denial Management | Monthly | Update business rules and edits as needed | X | X |
| Accounts Receivables Management | Denial Management | Ongoing | Provide necessary and supporting information for denial management | | X |
| Accounts Receivables Management | Payment Posting | Daily | Provide MMBS with confirmation of deposit if payment method is by check | | X |
| Accounts Receivables Management | Payment Posting | Daily | Provide confirmation of check cashed date to MMBS | | X |
| Accounts Receivables Management | Payment Posting | Daily | Post payments from paper EOBs (pre-requisite includes confirmation of check cashed date from Client) | X | |
| Accounts Receivables Management | Payment Posting | Daily | Inform MMBS of any payments received directly by Client or other address | | X |
| Accounts Receivables Management | Payment Posting | Daily | Upload manual payments from the payer website to the pDrive (unless portal login provided to MMBS) | | X |
| Accounts Receivables Management | Payment Posting | Daily | Post and resolve unapplied or unidentified payments | X | |
| Accounts Receivables Management | Payment Posting | Daily | Record and post correspondence received in the Client's lockbox, pDrive or other shared drive to appropriate patient account | X | |
| Accounts Receivables Management | Remittance Advice | Daily | Provide MMBS with any correspondence or EOBs received directly to Client or other address | | X |
| Accounts Receivables Management | Remittance Advice | Daily | Post ERAs to appropriate patient / guarantor accounts | X | |
| Accounts Receivables Management | Remittance Advice | Daily | Post denials from paper EOBs | X | |
| Accounts Receivables Management | Remittance Advice | Daily | Post all $0 pay ERAs | X | |
| Accounts Receivables Management | Credit Balance | Monthly | Identify reasons for credit balances | X | |
| Accounts Receivables Management | Credit Balance | Monthly | Address payer credit balances | X | |
| Accounts Receivables Management | Refunds | Weekly | Identify and submit accounts to Client for patient refund | X | |
| Accounts Receivables Management | Refunds | Weekly | Process and issue refunds | | X |
| Patient Responsibility Collections | Collections | Daily | Transfer balances to guarantors | X | |
| Patient Responsibility Collections | Collections | Weekly | Send out patient statements to insured patients owing a balance | X | |

| | | | | | |
|---|---|---|---|---|---|
| Patient Responsibility Collections | Collections | Daily | Provide Patient Customer Service with respect to billing matters (Patient Inquiries / Call Center) | x | |
| Patient Responsibility Collections | Collections | Daily | Collect and post patient payments received in Client's lockbox account | x | |
| Patient Responsibility Collections | Collections | Daily | Collect and post patient payments received via Customer Support | x | |
| Patient Responsibility Collections | Collections | Daily | Set up payment plans for patients | | x |
| Patient Responsibility Collections | Collections | Monthly | Provide a list of patient accounts for which MMBS believes it has exhausted commercially reasonable collection efforts | x | |
| Patient Responsibility Collections | Collections | Monthly | Transfer balance to collection agency | | x |
| Patient Responsibility Collections | Collections | Monthly | Write-off aged patient balances (after MMBS has determined commercially reasonable patient collection efforts have been exhausted) consistent with balance write-off policies | x | |
| Reporting | Metrics | Monthly | Provide Client with access to KPI dashboards | x | |
| Reporting | Metrics | Monthly | Provide Client with month end financial package | x | |
| Reporting | Metrics | Weekly | Track and provide Client with information regarding key metrics | x | |

\* MMBS shall only be required to use
commercially reasonable efforts to perform the
activities identified as being the responsibility of
MMBS in this table. MMBS may use its
discretion in electing to perform, or not to
perform, any of the activities identified as being
the responsibility of MMBS in this table.

**Addendum to the**
**REVENUE CYCLE MANAGEMENT AGREEMENT**

This Addendum to the Revenue Cycle Management Agreement (this **"Addendum"**) is effective as of the date last signed below (the **"Effective Date"**), and amends and is made part of the Revenue Cycle Management Agreement dated on or about February 18, 2022 (the **"RCM Agreement"**) by and between Modernizing Medicine Billing Services, LLC, a California limited liability company (**"MMBS"**), and Valley Eye Physicians and Surgeons P.C. (**"Client"**).

**AGREEMENTS**

In consideration of mutual promises and agreements below, the Parties hereto agree as follows:

1.    Capitalized terms used in this Addendum that are not otherwise defined herein shall have the meanings set forth in the RCM Agreement.

2.    The RCM Agreement is hereby amended to include the following as Section 5.

**"Joinder**: Client acknowledges and agrees that any affiliated entity and personnel of such affiliated entity may use or have access to the RCM Services, subject to the same restrictions on use and access as apply to Client, if and only if such affiliated entity and each of the Parties has executed a joinder to this Agreement covering the applicable products in a form satisfactory to MMBS (each, a **"Joined Party"**). Without limiting any other rights of MMBS, Client further agrees that MMBS may use and disclose any information that MMBS receives from Client or a Joined Party in connection with the provision of services to each of Client and such Joined Party or as otherwise not prohibited by this RCM Agreement. Client and any Joined Party shall not direct, request, permit or otherwise cause MMBS to disclose any information to the other in any manner that is prohibited by law or this Agreement. Notwithstanding any terms and conditions of this Agreement to the contrary: (i) no Joined Party may exercise Client's rights under this Agreement, Joined Parties shall only have the limited rights to use or have access to the RCM Services as specified in this Section 5 and no Joined Party shall have any rights under this Agreement (except as contemplated by the Business Associate Agreement) following the expiration or earlier termination of this Agreement; (ii) Client shall cause each of the Joined Parties and their personnel to comply with the terms and conditions of this Agreement as if the Joined Party were the Client; (iii) for purposes of determining any fees payable by Client pursuant to this Agreement, the definition of "Client" under this Agreement shall be deemed to include Client and each of the Joined Parties (provided that Client will be responsible for paying all fees applicable to Client and each of the Joined Parties); (iv) if this Agreement contemplates a limit on the number of Physicians and Physicians Extenders of Client in connection with the usage of the RCM Services then such limitation shall be deemed to be an aggregate limit applicable to Client and all of the Joined Parties; (v) any breach of any obligation under this Agreement by any Joined Party or its personnel shall be deemed a breach by Client of this Agreement for which Client will be responsible to MMBS; (vi) Client shall be responsible to MMBS for any acts or omissions of the Joined Parties; (vii) for purposes of determining MMBS's rights under this Agreement, the definition of "Client" under this Agreement shall be deemed to include Client and each of the Joined Parties, (viii) MMBS makes no representations or warranties of any kind to any Joined Party and MMBS disclaims all implied warranties, including any warranty of merchantability, fitness for a particular purpose and non- infringement, to the maximum extent permitted by applicable law, (ix)

no Joined Party is an intended third party beneficiary of this Agreement and none shall be entitled to assert any claims against MMBS; (x) the Business Associate Agreement shall (a) as between Client and MMBS, be deemed an agreement between Client and MMBS and (b) as between each Joined Party and MMBS, be deemed an agreement between such Joined Party and MMBS where such Joined Party is deemed the Client and (xi) Client or any Joined Party operating any facility shall be responsible for compliance with any Medicare or other applicable payer's conditions of participation or conditions for coverage, including, without limitation, any conditions with respect to medical records or operating as a distinct entity from a Client.

**Joined Party**: Gisela Velez, MD, LLC

3.  All terms of the RCM Agreement shall remain in full force and effect as supplemented hereby.

IN WITNESS WHEREOF, the Parties hereto have signed this Addendum by their duly authorized representative on the dates indicated below.

**Valley Eye Physicians and Surgeons P.C.**

By: _Gisela Velez (Feb 25, 2022 14:23 EST)_

Print Name: Gisela Velez

Title: Owner, Associate

Date: Feb 25, 2022

**Modernizing Medicine Billing Services, LLC**

By: Eric Grill

Name: Eric Grill

Title: Director of Deal Desk

Date: Feb 28, 2022

## JOINDER

Subject to the written consent of Modernizing Medicine Billing Services, LLC ("**MMBS**") and Valley Eye Physicians and Surgeons P.C. ("**Client**") to such joinder, by signing below, Gisela Velez, MD, LLC hereby agrees to be bound by that certain Revenue Cycle Management Agreement dated on or about the date hereof by and between MMBS and Client (as amended, modified and/or amended and restated from time to time, "**Agreement**") as a Joined Party (as defined in the Agreement) as contemplated by Se the Agreement. The Joined Party acknowledges that Client is MMBS's customer and that, accordingly, MMBS makes no warranties of any kind to the Joined Party and MMBS expressly disclaims all implied warranties to the Joined Party, including any warranty of merchantability, fitness for a particular purpose and non-infringement, to the maximum extent permitted by applicable law. Joined Party further agrees that it shall guarantee the payment of any Fees and/or SOW Expenses owed by Client to MMBS pursuant to the Agreement.

**GISELA VELEZ, MD, LLC**

By: _Gisela Velez (Feb 25, 2022 14:23 EST)_

Print Name: Gisela Velez

Title: Owner, Associate

Date: Feb 25, 2022

**Acknowledged and agreed to by:**

**MODERNIZING MEDICINE BILLING SERVICES, LLC**

By: _Eric Grill_

Print Name: Eric Grill

Title: Director of Deal Desk

Date: Feb 28, 2022

**VALLEY EYE PHYSICIANS AND SURGEONS P.C.**

By: _Gisela Velez (Feb 25, 2022 14:23 EST)_

Print Name: Gisela Velez

Title: Owner, Associate

Date: Feb 25, 2022

## STATEMENT OF WORK

This Statement of Work (this "**SOW**") is entered into on the date last signed below (the "**Effective Date**"), pursuant to the terms and conditions of the Revenue Cycle Management Agreement (the "**RCM Agreement**") dated as of February 18, 2022, by and between Modernizing Medicine Billing Services, LLC, a California limited liability company ("**MMBS**"), Valley Eye Physicians and Surgeons P.C. ("**Client**"), and Gisela Velez, MD, LLC ("**Joined Party**"). Capitalized terms used in this SOW that are not otherwise defined herein shall have the meanings set forth in the RCM Agreement.

1.   **Scope of Services**

Client and Joined Party shall provide MMBS with the charge information for encounters with dates of service between April 25, 2021 through April 24, 2022 (the "**Pre-RCM Services Commencement Date Encounters**"). MMBS shall process the previously denied outstanding account receivables for the Pre-RCM Services Commencement Date Encounters and take such billing and collection efforts with respect to each such Pre-RCM Services Commencement Date Encounter as MMBS deems appropriate in its sole discretion pursuant to the RCM Agreement.

2.   **Fees & Payment Terms**

Client will pay MMBS 3.65% of SOW Net Collections (as defined below) and (y) Six Dollars ($6.00) per J-Code Transaction (as defined in the RCM Agreement) for the prior month (the "**Collection Fee**"). MMBS shall present Client with an invoice ("**Collection Invoice**") each month setting forth the Collection Fee (if any) payable to MMBS by Client for the prior month. Client shall pay MMBS the Collection Fee (if any) detailed in each Collection Invoice upon the date of such Collection Invoice.

"**SOW Net Collections**" shall mean the total sum of all monies collected, directly or indirectly, by or through MMBS (or by or through third parties contracted by MMBS) with respect to the Pre-RCM Services Commencement Date Encounters; provided, however that SOW Net Collections shall not include any monies collected, directly or indirectly, by or through MMBS (or by or through third parties contracted by MMBS) for the drug/injectable charges for the J-Code Transactions.

3.   **Miscellaneous Terms**

Client and Joined Party acknowledge and agree that MMBS shall have no liability of any kind with respect to the Pre-RCM Services Commencement Date Encounters, including, without limitation, any liability related to timely filing claim deadlines with respect to the Pre-RCM Services Commencement Date Encounters.

MMBS MAKES NO WARRANTY OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, WITH RESPECT TO THE SERVICES PROVIDED PURSUANT TO THIS SOW. MMBS HEREBY SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW. IN NO EVENT SHALL MMBS' AND ITS PRESENT AND FORMER SUBSIDIARIES', AFFILIATES', MANAGERS', OFFICERS', EMPLOYEES', AND AGENTS' AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS SOW, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR UNDER ANY OTHER THEORY OF LIABILITY, EXCEED THE AMOUNT ACTUALLY PAID BY CLIENT TO MMBS PURSUANT TO THIS SOW. THIS PARAGRAPH SHALL SURVIVE THE EXPIRATION OR EARLIER TERMINATION OF THIS SOW.

In the event of any conflict between the terms of the RCM Agreement and this SOW, the terms of this SOW shall prevail

IN WITNESS WHEREOF, the parties hereto have signed this SOW by their duly authorized representative on the dates indicated below.

**Valley Eye Physicians and Surgeons P.C.**

By: _Gisela Velez (Feb 25, 2022 14:23 EST)_

Print Name: Gisela Velez

Title: Owner, Associate

Date: Feb 25, 2022

**Modernizing Medicine Billing Services, LLC**

By: _Eric Grill_

Name: Eric Grill

Title: Director of Deal Desk

Date: Feb 28, 2022

**Gisela Velez, MD, LLC**

By: _Gisela Velez (Feb 25, 2022 14:23 EST)_

Print Name: Gisela Velez

Title: Owner, Associate

Date: Feb 25, 2022

Exhibit 3

## RCM STANDARD TERMS AND CONDITIONS

These RCM Standard Terms and Conditions (these "**Terms and Conditions**") form a part of the Revenue Cycle Management Agreement (the "**RCM Agreement**" and together with these Terms and Conditions, this "**Agreement**") between Modernizing Medicine Billing Services, LLC, a California limited liability company with an office located at 4850 T-Rex Avenue, Suite 200, Boca Raton, Florida 33431 ("**MMBS**"), and the client of MMBS set forth in the RCM Agreement (the "**Client**"). All capitalized terms set forth herein shall have the meaning set forth in the RCM Agreement unless expressly provided to the contrary herein. These Terms and Conditions were last updated on June 1, 2021.

1.     **Definitions**. As used in this Agreement:

1.1     "**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such Person now or in the future for so long as such control exists. For purposes of this definition, "control," when used with respect to any specified Person, means the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through ownership of voting securities or by contract or otherwise, and the terms "controlling" and "controlled by" have correlative meanings to the foregoing.

1.2     "**Authorized Providers**" means the number of Physicians and Physician Extenders specified in the Transaction Documents as being authorized to use the RCM Services.

1.3     "**Authorized Rooms**" means the number of Rooms specified in the Transaction Documents as being authorized for use in conjunction with RCM Services.

1.4     "**Billing Implementation Fee**" means the Billing Implementation Fee listed, on the Effective Date, on Schedule "B" to the RCM Agreement.

1.5     "**Billing Information**" means all billing and encounter information and documentation for all patients of Client, including, but not limited to the name of the patient, patient demographics, patient contact information, insurance information (including a copy or scanned copy of insurance cards along with any required referral or authorization information), the date of service, the nature and extent of services provided, the applicable CPT Codes (as defined in Section 2.2.2 or other procedure codes, ICD-9 Codes (as defined in Section 2.2.2), ICD-10 Codes as defined in Section 2.2.2) or other diagnosis codes, and any supporting medical information that is necessary to obtain payment or reimbursement for services.

1.6     "**Client Data**" means any electronic data, information or material that MMBS receives from or on behalf of Client, Client's Patients and/or users of ModMed Software (or at any of their direction) through the ModMed Software or otherwise in connection with this Agreement or the other Transaction Documents, including, without limitation, (i) any electronic data, information or material entered into the ModMed Software, (ii) any electronic data, information or material imported into the ModMed Software relating to Client or any of its Patients, (iii) Patient Data and (iv) any electronic data, information or material provided or submitted by a third party through the ModMed Software relating to the Client or any of its Patients.

1.7     "**Delinquent Account**" means a payment that MMBS determines, in its sole discretion, is not reasonably collectible by MMBS.

1.8     "**HIPAA**" means the Health Insurance Portability and Accountability Act of 1996, the Health Information Technology for Economic and Clinical Health Act and their implementing regulations, as each may be amended from time to time.

**1.9** **"Insurance Eligibility Verification Services"** means using commercially reasonable efforts to attempt to ascertain from information provided to MMBS by Client, Payers or other sources deemed appropriate by MMBS whether patients of Client are eligible for medical or other health benefits or insurance or Government Payer Program (as defined below) coverage for contemplated treatment by Client.

**1.10** **"MMBS"** means Modernizing Medicine Billing Services, LLC, a California limited liability company.

**1.11** **"ModMed Software"** means any proprietary software of Modernizing Medicine or its Affiliates used by Client or any of its Patients.

**1.12** **"Modernizing Medicine"** means Modernizing Medicine, Inc., a Delaware corporation, and its subsidiaries.

**1.13** **"Patient(s)"** means any individual who was a previous or is a prospective or current patient of Client.

**1.14** **"Patient Data"** means any electronic data, information or material about a Patient entered into the ModMed Software.

**1.15** **"Payer"** means any Government Payer Program, insurance carrier or provider or other third party responsible for payment for health care items or services provided or furnished by Client or its Providers.

**1.16** **"Person"** means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization.

**1.17** **"Physician"** means an individual duly licensed by the appropriate state authorities to practice medicine or surgery (including, without limitation, an ophthalmologist or optometrist).

**1.18** **"Physician Extender"** means any medically trained and appropriately licensed professional, other than a Physician, including, without limitation, nurse practitioners and physician assistants.

**1.19** **"RCM Services"** has the meaning set forth in Schedule "A" to the RCM Agreement.

**1.20** **"RCM Services Commencement Date"** shall be the date specified in Schedule "A" to the RCM Agreement as the RCM Services Commencement Date; provided that MMBS may change such date to a later date in its discretion.

**1.21** **"Representative"** means, as to MMBS, each of MMBS' employees, directors, officers, advisors, agents, vendors, any Person that provides any products or services that relate to the RCM Services or any other MMBS products or services (including, without limitation, laboratories and other diagnostic, clinical and pathology testing providers), service providers, consultants and contractors and each of MMBS' Affiliates (including, without limitation, Modernizing Medicine) and each of such Affiliates' employees, directors, officers, Affiliates, advisors, agents, vendors, any Person that provides any products or services (including, without limitation, laboratories and other diagnostic, clinical and pathology testing providers), service providers, consultants and contractors.

**1.22** **"Room"** means each room of Client used to perform medical procedures.

**1.23** **"Transaction Documents"** means this Agreement (including the RCM Agreement, these Terms and Conditions and the Business Associate Addendum (as defined below)), the exhibits hereto, any

addendums to this Agreement entered into in accordance with these Terms and Conditions, any Statement of Work (as defined below) and the Electronic Payment Authorization Form (as defined below).

**2.    RCM Services; Contact Information.**

**2.1    Exclusivity.** Client shall take such actions as may be necessary to designate MMBS as the sole billing and collection agent for Client. Client shall not carry on any billing or collection activities either on its own or through a third party during the term of this Agreement other than as specified on Schedule "A" to the RCM Agreement (the "**RCM Exclusivity**").

**2.2    Client Responsibilities.**

**2.2.1    Billing Information and Supporting Documentation.** When requested by MMBS, Client shall submit to MMBS in a prompt and timely manner (but no longer than three (3) business days following such request) all Billing Information and other documentation necessary to support Client's claims for medical and other items and services including, to support the use of any ICD-9 Code, ICD-10 Code, CPT Code or other code used to bill for such items or services provided by Client and identify any Payer. Such documentation shall include, at a minimum, the following: (a) dated and authenticated medical records, including, without limitation, Providers' progress notes, documentation of all services rendered and/or products supplied, appropriate patient histories and evaluations, treatment plans and the documentation of the medical necessity and reasons for the patient encounter, services and/or products; (b) patient consents, releases, assignments of benefits and other patient approvals; (c) physician orders and prescriptions; (d) patient insurance information necessary for MMBS to submit accurate and complete billing claims to the appropriate Payer; and (e) any other documentation that is necessary to obtain payment. Client shall also submit any further documentation as requested from time to time by MMBS; including, without limitation, documentation that is necessary, in MMBS's sole discretion, to: (x) clarify or correct any documentation that MMBS (or any Payer to whom a claim is submitted) deems confusing, unclear, or ambiguous; or (y) resubmit a claim that a Payer has disputed or denied. Without limiting the foregoing, Client hereby authorizes MMBS to obtain any information from the ModMed Software or from MMBS' Representatives that MMBS deems appropriate to provide the RCM Services. Client shall comply with all MMBS practices and procedures with respect to the submission of Billing Information and other information and documentation to MMBS as MMBS may inform Client of from time to time.

**2.2.2    Coding Activities.** Client agrees and acknowledges that Client is solely and completely responsible in all respects for: (a) the coding of medical diagnoses and utilization of the International Classification of Diseases, Ninth Revision, Clinical Modification codes ("**ICD-9 Codes**"), the International Classification of Diseases, Tenth Revision, Clinical Modification codes ("**ICD-10 Codes**") and other diagnosis codes; (b) assignment of place of service codes for items dispensed and services rendered; (c) the coding of medical procedures or utilization of Current Procedural Terminology codes ("**CPT Codes**") or other procedure codes, including, without limitation, modifiers of CPT Codes; (d) activity linking ICD-9, ICD-10 and CPT Codes in any claim for an item or service to any Payer; (e) the determination of the number of units of any procedure codes; (f) the preparation of any clinical documentation forming the basis for the utilization of any ICD-9 Code, ICD-10 Code, CPT Code, or other code; and (g) otherwise accurately, completely and properly identifying and describing services and products rendered or supplied by Client or Client's Providers (collectively, "**Coding Activities**"). Client acknowledges and agrees that Client is solely and completely responsible for ensuring that all medical services forming the basis for Coding Activities were: medically necessary and appropriate; actually rendered; accurately, completely and otherwise properly documented; and properly communicated to MMBS. Client is responsible for identifying the rendering Provider and, as applicable, the supervising, ordering and referring Provider for any services.

**2.2.3    Form Execution.** Client shall execute such forms (and/or shall cause any of Client's Providers or other personnel, as necessary, to execute such forms), including, without limitation, assignments and re-assignments, as may be required to permit MMBS to provide the RCM Services on behalf of Client. Without limiting the foregoing, Client shall accurately complete all clinical and charge source data and insurance forms and provide such forms to MMBS in a timely manner (but no later than three (3) business days after the applicable patient encounter). Any charge submitted to MMBS by Client that is missing any of the billing information required by MMBS may be returned by MMBS to Client.

**2.2.4.    Authorized Providers and Authorized Rooms.** If the Transaction Documents specify a number for each type of Authorized Provider and Authorized Room, Client acknowledges and agrees that such number for each such type of Authorized Provider and Authorized Room may not be decreased by Client during the Term without the written consent of MMBS.

**2.2.5    Compliance.** Client shall comply, and shall cause each of Client's Providers and other personnel to comply, with all applicable federal, state and local laws and regulations and the applicable Payer's provider manuals, procedures and other rules relating to the provision of items and services and the billing and collection of fees for such services (collectively, **"Payer Rules"**). Without limiting the foregoing, Client shall comply with applicable Payer Rules governing the assignment and reassignment of benefits, including, but not limited to (a) obtaining the signature of each patient (or the appropriate responsible party) authorizing the submission of claims for reimbursement for items and services provided to such patient; (b) maintaining such information or copies thereof in Client's records; and (c) providing such patient authorization to MMBS upon MMBS' request. Client shall, within three (3) business days upon Client's receipt thereof, provide MMBS with copies of any communications from patients or Payers with respect to the claims submitted pursuant to this Agreement, including, without limitation, explanations of benefits or other information showing payments, partial payments, deductible, copayment and coinsurance information or amounts, and all denied or rejected billing claims.

**2.2.6    Notification.** Client shall notify MMBS within seven (7) business days of receiving notice or advice that such party or any of its Providers or other personnel is, or has become, the subject of, or to, any order, agreement, settlement or memorandum of understanding directed or issued by any federal or state agency charged with the supervision or regulation of medical practices, physicians or other healthcare providers or any other governmental agency having supervisory or regulatory authority with respect to Client's business. Client represents and warrants that: (i) it is not under a corporate integrity agreement or any other restriction or investigation by any payer; (ii) neither it nor any of its Providers or other employees or contractors are listed on the General Services Administration's Excluded Parties List System (**"GSA List"**), (iii) neither it nor any of its Providers or other employees or contractors are suspended or excluded from participation in Medicare, Medicaid or any other Federal Health Care Program (as defined in 42 U.S.C. § 1320a-7b(f)) or any other government program (collectively, **"Government Payer Programs"**); and (iv) to its knowledge, there are no pending or threatened governmental investigations against it or any of its Providers or other employees or contractors that may lead to suspension or exclusion from Government Payer Programs or may be cause for listing on the GSA List (collectively, and **"Investigation"**). Client shall notify MMBS of the commencement of any Investigation within two (2) business days of first learning of such and MMBS shall have the right to terminate this Agreement: (a) upon thirty (30) days' advance written notice upon learning of any such action, or (b) within seven (7) business days of notice that the other party will be excluded from participation in any Government Payer Programs.

**2.2.7    Billing Claims.** If Client submits a request for the preparation of a claim for reimbursement to MMBS, Client hereby warrants and represents that no bill for such services or products has been previously submitted to the patient or any Payer except as may be related to any portion of such payment (*e.g.*, co-payment) owed individually by such patient. Client agrees that MMBS may prepare and submit all claims

4

for reimbursement in Client's name and under its provider number, and Client shall indicate that MMBS is acting as a billing agent for Client to all Government Payer Programs and other Payers.

**2.2.8    Lockbox.**  Subject to MMBS' approval of the Bank (as defined below), Client shall open and maintain a bank account in Client's name with a bank or other organization that provides lock box services of Client's choosing ("**Bank**") that shall be maintained in lockbox form into which payments from Payers and patients shall be deposited ("**Lock Box Account**").  Client shall request the Bank to forward digital copies of all checks, payments and explanations of benefits to MMBS, so that MMBS can complete proper payment posting.  Without limiting the foregoing, Client will make all explanations of benefits and payments received by Client, as it relates to MMBS billing services attributable to Client's patients available to MMBS within seventy-two (72) hours of receipt through such methods as MMBS may request. Client shall be the only signatory on the Lock Box Account; *provided, however,* that MMBS shall have the authority to deposit to, but not withdraw from, the Lock Box Account and shall have "read only" access to the account.  Client shall arrange for the Bank to provide monthly bank statements describing deposits to and withdrawals from the Lock Box Account to both MMBS and Client.  To facilitate MMBS's access to such lockbox and to carry-out the provisions of this Section, Client shall complete and submit to Bank such forms as the Bank or MMBS may request.  Client acknowledges and agrees that Client shall be solely responsible for all fees and costs related to the Lock Box Account.

**2.2.9    Provider Numbers.**  Client shall procure and maintain current National Provider Identifiers and other necessary provider numbers for all of Client's Providers, as necessary or appropriate to allow MMBS to obtain payment or reimbursement from Payers, and Client will provide MMBS with all such information, and any updates or modifications to such information, within the timeframe reasonably requested by MMBS.

**2.2.10  Insurance Eligibility Verification.**  If <u>Schedule "A"</u> to the RCM Agreement indicates that MMBS is to provide Insurance Eligibility Verification Services to Client then Client shall provide each Patient's name and any other patient or insurance related information reasonably requested by MMBS to MMBS at least one (1) business day following the making of each Patient appointment with Client.  If <u>Schedule "A"</u> to the RCM Agreement indicates that MMBS is to provide Insurance Eligibility Verification Services to Client then Client hereby authorizes MMBS to take any actions determined appropriate by MMBS relating to the Insurance Eligibility Verification Services.  Client acknowledges and agrees that MMBS makes no warranties of any kind regarding the provision of Insurance Eligibility Verification Services and that MMBS has no liability of any kind relating to the Insurance Eligibility Verification Services, including, without limitation, no liability with respect to any refusal by an insurance provider to pay any insurance claims or any insurance coverage dispute.  MMBS may elect to cease providing Insurance Eligibility Verification Services to Client for any reason following written notice of such cessation to Client.

**2.2.11  General Statement.**  Client hereby authorizes MMBS to take any actions determined appropriate by MMBS relating to the RCM Services.  Client is solely responsible for the timely provision, accuracy, adequacy and completeness of any and all Billing Information and other data provided to MMBS hereunder, or input by Client into the ModMed Software.  Client shall not take any action that could reasonably be expected to interfere with MMBS' performance of the RCM Services. Client acknowledges that MMBS is not obligated to provide any collection services for Client's billings and accounts receivable in the event of payment delinquencies by Payers.  Client agrees that Client shall only submit (and shall only cause MMBS to submit) claims for reimbursement, which Client believes are true, correct and in accordance with applicable law and health plan coverage requirements.  Client agrees to promptly correct and resubmit any Billing Information and claims which MMBS returns due to a compliance related error.  Client acknowledges and agrees that MMBS may contact patients of Client and accept credit card and other payments from patients on behalf of Client. Client shall provide accurate patient contact information to MMBS promptly following MMBS' request.

5

**2.3.    Client Contact Information.** On or prior to the Effective Date, Client shall provide to MMBS Client's contact information and designate a contact person. If Client's contact person or contact information changes at any time during the Term, Client shall, no later than five (5) business days prior to such change, provide notice of Client's new contact person or contact information to MMBS in writing.

**2.4    Trading Partner Agreement.** Neither Party may do any of the following: (a) change the definition, data condition, or use of a data element or segment in a standard or operating rule, except where necessary to implement State or Federal law, or to protect against fraud and abuse; (b) add any data elements or segments to the maximum defined data set; (c) use any code or data elements that are either marked "not used" in the standard's implementation specification or are not in the standard's implementation specification(s); or (d) change the meaning or intent of the standard's implementation specification(s).

**3.    Fees.**

**3.1    RCM Fees.** Client shall pay MMBS the monthly RCM Fees specified on Schedule "B" of the RCM Agreement.

**3.2    Billing Implementation Fee.** Client shall pay MMBS the Billing Implementation Fee specified on Schedule "B" of the RCM Agreement.

**3.3    Other Fees.** In addition to the RCM Fees and the Billing Implementation Fee, Client shall pay MMBS such other fees as are specified on Schedule "B" of the RCM Agreement or elsewhere in this Agreement.

**3.4    Expense Reimbursement.** Client will reimburse MMBS for the following expenses incurred by MMBS or its personnel in connection with the performance of the RCM Services (the "**RCM Expenses**"): all reasonable out-of-pocket costs and all reasonable travel, lodging and other related expenses.

**3.5    Overdue Payments.** Any payment owed by Client to MMBS hereunder and not paid to MMBS when due (an "**Overdue Payment**") may accrue, at MMBS' discretion, late charges at the rate of one and one-half percent (1.5%) of the outstanding balance per month, or at the maximum rate permitted by law, whichever is lower, from the date such payment was due until the date paid.

**3.6    Payment.**

**3.6.1    Invoice.** Each month MMBS shall present Client with an invoice ("**Invoice**") setting forth the RCM Fees and other Fees (if any) payable to MMBS by Client for the prior month. Client shall pay MMBS the RCM Fees and other Fees (if any) detailed in each Invoice upon the date of such Invoice.

**3.6.2    Billing Implementation Fee.** The Billing Implementation Fee is payable on the execution of this Agreement by Client and MMBS shall have no obligation to issue a separate Invoice to Client with respect to the Billing Implementation Fee.

**3.7    Payment Method.** Client shall pay MMBS for all fees due through the Automated Clearing House ("**ACH**"). Upon MMBS' request, Client shall execute, complete and deliver to MMBS the electronic payment authorization form (the "**Electronic Payment Authorization Form**") provided to Client by MMBS or otherwise use such payment portal as directed by MMBS. If the account or other information specified in the Electronic Payment Authorization Form or portal changes during the Term, Client shall provide MMBS with a revised Electronic Payment Authorization Form or otherwise update the portal in a timely manner so as to avoid incurring an Overdue Payment. Client hereby authorizes MMBS to automatically charge Client's account designated in the Electronic Payment Authorization Form an amount

6

equal to the sum of any fees and/or expenses owing to MMBS pursuant to an invoice five (5) days after the date of such invoice specifying such fees and/or expenses.

**3.8    Changes to Fees.** MMBS may change the fees (including, without limitation, the RCM Fees) and discounts set forth in the Transaction Documents by providing at least thirty (30) days prior written notice (the "**Notice Period**") of such change to Client. Any such change shall take effect at the beginning of the next Renewal Term after the expiration of the Notice Period.

**3.9    Currency.** All amounts set forth in the Transaction Documents are denominated and shall be paid in U.S. dollars.

**3.10    Suspension of Service.** If there are Overdue Payments outstanding for more than thirty (30) days, MMBS reserves the right to suspend Client's access to all of MMBS' products and services until such amounts are paid in full. Client shall continue to be obligated to pay the Fees during such suspension period.

**3.11    Taxes.** All amounts payable by Client to MMBS pursuant to the Transaction Documents (including, without limitation, pursuant to any Statement of Work) are exclusive of all local, state, federal and foreign taxes, levies, or duties of any nature ("**Taxes**"), and all payments to MMBS are payable in full without reduction for Taxes. Client is responsible for payment of all Taxes, excluding taxes owed by MMBS based on MMBS' net income. If MMBS has the legal obligation to pay or collect Taxes for which Client is responsible pursuant to this Section, the appropriate amount shall be invoiced to and paid by Client, unless Client provides MMBS with a valid tax exemption certificate authorized by the appropriate taxing authority.

**3.12    Deposits.** All deposits are non-refundable under any circumstances.

**4.    Hardware; Software; Service Guidelines.**

**4.1    Hardware; Software.** Client is solely responsible for acquiring, installing and maintaining any computer hardware or software necessary for Client to receive the RCM Services. MMBS will not provide maintenance for any of Client's hardware or software unless otherwise specifically agreed upon in a separate agreement between Client and MMBS. Client expressly acknowledges that MMBS is not responsible for the safeguard, loss, or recovery of any data stored on Client's hardware.

**4.2    Service Guidelines.** Client and its personnel shall use any services provided by MMBS solely for Client's internal business purposes only as contemplated by this Agreement and shall not use any products or services provided by MMBS to: (i) send spam or any other form of duplicative or unsolicited communications; (ii) violate any law, rule or regulation; (iii) transmit through or post on MMBS' website(s) unlawful, immoral, libelous, tortious, infringing, defamatory, threatening, vulgar, or obscene material or material harmful to minors; (iv) transmit material containing software viruses or other harmful or deleterious computer code, files, scripts, agents, or programs; (v) interfere with or disrupt the integrity or performance of any MMBS products or services or the data contained therein; (vi) attempt to gain unauthorized access to any MMBS products or services, RCM Services or computer systems or networks used to host or provide access to MMBS products or services; or (vii) harass or interfere with another user's use and enjoyment of any products or services provided by MMBS. In addition to any other remedies MMBS may have, MMBS reserves the right to terminate any of the Transaction Documents immediately and without notice, if MMBS becomes aware or determines that Client or any of its personnel are violating any of the foregoing guidelines.

**5.    Modifications to Services.** Notwithstanding anything in the Transaction Documents to the

contrary, MMBS may, in its sole discretion, modify, update, revise, enhance or change any aspect of the RCM Services. Notwithstanding anything in the Transaction Documents to the contrary, Client acknowledges and agrees that MMBS is under no obligation to provide Client with access to any third-party software, website or service as part of the RCM Services and to the extent that the RCM Services provide access to any third-party software, website or service MMBS reserves the right, without prior notice, to suspend, limit or cancel such access for any reason.

### 6. SOW Services.

**6.1 Statements of Work.** From time to time, the Parties may execute statements of work that describe the specific services to be performed by MMBS, including any work product to be delivered by MMBS (as executed by the Parties, a **"Statement of Work"**). Each Statement of Work will expressly refer to this Agreement, will form a part of this Agreement, and will be subject to the terms and conditions contained herein.

**6.2 Performance of Services.** MMBS will perform the services specified in each Statement of Work (the **"SOW Services"**) in accordance with the terms and conditions of this Agreement and of each applicable Statement of Work.

**6.3 Changes to Statement of Work.** Client may submit to MMBS written requests to change the scope of SOW Services (each such request, a **"Change Order Request"**). MMBS may approve or reject such Change Order Requests in its sole discretion. If MMBS approves a Change Order Request, then MMBS will promptly notify Client if it believes that such Change Order Request requires an adjustment to the SOW Fees (as defined below) or to the schedule for the performance of the SOW Services. In such event, the Parties will negotiate in good faith a reasonable and equitable adjustment to the SOW Fees and/or schedule, as applicable. MMBS will continue to perform SOW Services pursuant to the existing Statement of Work and will have no obligation to perform any Change Order Request unless and until the Parties have agreed in writing to such an equitable adjustment to the SOW Fees and/or schedule, as applicable.

**6.4 Client Responsibilities.** In connection with the SOW Services, Client will: (i) provide qualified personnel who are capable of performing Client's duties and tasks with respect to applicable SOW Services; (ii) provide MMBS with access to Client's sites and facilities during Client's normal business hours and as otherwise reasonably required by MMBS to perform the SOW Services; (iii) provide MMBS with such working space and office support (including access to telephones, photocopying equipment, and the like) as MMBS may reasonably request; and (iv) perform Client's duties and tasks under this Agreement, including under any Statement of Work, and such other duties and tasks as may be reasonably required to permit MMBS to perform the SOW Services. Client will also make available to MMBS any data, information and any other materials required by MMBS to perform the SOW Services, including, but not limited to, any data, information or materials specifically identified in this Agreement (collectively, **"Client Materials"**). Client will be responsible for ensuring that all such Client Materials are accurate and complete.

**6.5 SOW Fees and Expenses.** For MMBS' performance of the SOW Services, Client will pay MMBS the fees calculated in accordance with the terms set forth in this Agreement, including, any applicable Statement of Work (the **"SOW Fees"**): In addition, Client will reimburse MMBS for the following expenses incurred by MMBS or its personnel in connection with the performance of the SOW Services (the **"SOW Expenses"**): all out-of-pocket costs and all travel, lodging and other related expenses.

**6.6 SOW Payment Terms.** Unless otherwise specified in this Agreement or the applicable Statement of Work, MMBS shall send one or more invoices (each, a **"SOW Invoice"**) to Client for all applicable SOW Fees and SOW Expenses contemplated by the applicable Statement of Work. Unless otherwise

specified in the applicable Statement of Work, all amounts specified in a SOW Invoice are due upon the issuance of such SOW Invoice by MMBS.

**6.7     Ownership.** MMBS will exclusively own all rights, title and interest in and to any software programs, software tools, utilities, technology, processes, inventions, devices, methodologies, specifications, documentation, training manuals, techniques and materials of any kind used or developed by MMBS or its personnel in connection with performing the SOW Services (collectively "**MMBS Materials**"), including all worldwide patent rights (including patent applications and disclosures), copyright rights, moral rights, trade secret rights, know-how and any other intellectual property rights therein. Client will have no rights in the MMBS Materials except as expressly agreed to in writing by the Parties in the Statement of Work.

**6.8     Other Services.** Nothing in this Agreement or any Statement of Work will be deemed to restrict or limit MMBS' right to perform similar services for any other party or to assign any employees or subcontractors to perform similar services for any other party. Client acknowledges that MMBS may engage subcontractors to perform certain services.

**6.9     Non-Solicitation.** During the Term and for a period of twelve (12) months thereafter, Client will not recruit or otherwise solicit for employment any employees of MMBS or its Affiliates without MMBS' express prior written approval.

**7.     Intellectual Property.**

**7.1     Client Intellectual Property.** Client represents and warrants that none of the content, materials, designs, text, names, data or other information, including, without limitation, Client Data, provided by Client, its personnel and/or its Patients to MMBS with respect to the Transaction Documents or otherwise (collectively, "**Client Content**"), infringes or violates the intellectual property or other proprietary rights of MMBS or any third party, and MMBS shall have no liability for any claims arising out of Client Content, including those claims based on infringement. Further, Client and its personnel grant to MMBS a nonexclusive license to use Client Content, as well as any trade names and/or trademarks of Client, to the extent necessary for MMBS to provide the RCM Services, the SOW Services and any other products or services contemplated by the Transaction Documents (which includes, without limitation, the right to make copies, create illustrations, display personal and/or corporate name(s), and display other Client Content). Nothing in this Section 7.1 shall be deemed to limit MMBS's rights under Section 10.4 of these Terms and Conditions or under the Business Associate Addendum.

**7.2     Restrictions.** Client acknowledges that in providing the RCM Services, the SOW Services and any other products or services contemplated by the Transaction Documents, MMBS utilizes: (i) the MMBS name, the MMBS logo, certain domain names, the product names associated with MMBS' products and services and other trademarks; (ii) certain information, documents, software and other works of authorship; and (iii) other technology, software, hardware, products, processes, algorithms, user interfaces, website content, visual interfaces, interactive features, graphics, compilations, computer code, website elements, Written Documentation, know-how and other trade secrets, techniques, designs, inventions and other tangible or intangible technical material or information (which shall be collectively referred to as "**MMBS IP**") and that the MMBS IP is covered by intellectual property rights owned or licensed by MMBS ("**MMBS IP Rights**"). Except as otherwise expressly permitted herein, Client and its personnel shall not, nor will they assist or encourage anyone else to: (i) sell, license, distribute, publicly perform or display, transmit, edit, adapt, modify, copy, translate or make derivative works based on the MMBS IP; (ii) disassemble, reverse engineer, or decompile any of the MMBS IP; or (iii) create Internet "links" to or from the MMBS IP, or "frame" or "mirror" any of MMBS' content which forms part of the MMBS IP (other than on Clients' own internal intranets). Additionally, Client and its personnel are not entitled to and will

not: (i) sell, grant a security interest in or make or transfer reproductions of the MMBS IP to other parties in any way, nor to lease or license the MMBS IP to others without the prior written consent of MMBS; (ii) emulate or redirect the communication protocols used by the MMBS IP; (iii) use or access the MMBS IP, RCM Services or any other products or services contemplated by the Transaction Documents in order to build a competitive product or service, (iv) copy any features, functions or graphics of the MMBS IP, RCM Services or any other products or services contemplated by the Transaction Documents or (v) exploit the MMBS IP or any of its parts for any commercial purpose without MMBS' express written consent. Nothing in the Transaction Documents shall be construed to give Client or its personnel any right to inspect, possess, use, or copy the source code or object code used to create or constituting the MMBS IP. Neither Client nor its personnel shall apply any process, technique, or procedure designed to ascertain or derive the source code of the MMBS IP, or attempt to do any of the foregoing. Client shall not make any copies of any products or services provided by MMBS to Client. Client shall not alter, change or remove any proprietary notices or confidentiality legends placed on or contained within any products or services provided by MMBS to Client.

**7.3   Ownership and Reservation of Rights.** Other than as expressly set forth in the Transaction Documents, no license or other rights in the MMBS IP Rights are granted to Client or its personnel, and all such rights are hereby expressly reserved by MMBS. Additionally, and for avoidance of doubt, as between MMBS and Client, MMBS shall at all times retain sole and exclusive ownership of, or, as applicable, sole and exclusive rights as a licensee or sublicensee of, all of its copyrights, trademarks, trade names, trade dress, patents, software, source code, object code and other intellectual property rights with respect to the MMBS IP, including, without limitation, all of the proprietary material provided and/or displayed by MMBS at affiliated web sites, extranet, marketing materials or otherwise. Client acknowledges and agrees that the MMBS IP may contain certain licensed materials and MMBS' licensors may independently protect their rights in the event of any violation of the Transaction Documents.

**8.   Remedies for Breach of Client's Obligations.** If Client or any of its personnel materially breaches any of its or their obligations under this Agreement, any other Transaction Document or any agreement between an Affiliate of MMBS and Client, MMBS shall be permitted, at its sole discretion, to do any or all of the following (it being understood that such remedies are not exclusive of one another or any other remedies MMBS may have under any of the Transaction Documents or at equity or law): (i) terminate any of the Transaction Documents and any license or other right granted to Client with respect to MMBS' products or services upon notice if such breach is not cured within thirty (30) days after notice of such breach is sent to Client, in which case all Fees, RCM Fees, Billing Implementation Fees, SOW Fees and SOW Expenses incurred prior to the date of termination shall remain due and owing to MMBS; (ii) for unpaid Fees, RCM Fees, Billing Implementation Fees, SOW Fees and SOW Expenses, assess late fees as provided in Section 3.5; and/or (iii) collect from Client reimbursement for all costs incurred by MMBS in collecting any Fees, RCM Fees, Billing Implementation Fees, SOW Fees, SOW Expenses or other monies owed to it by Client, or otherwise enforcing its rights under the Transaction Documents. Client further acknowledges and agrees that MMBS shall not be liable to Client or any third party for any exercise of MMBS' rights under the Transaction Documents.

**9.   Business Associate Addendum.** The Parties acknowledge and agree that Client is a Covered Entity and MMBS is a Business Associate under HIPAA and each Party shall comply with the Party's respective obligations under HIPAA. Without limiting the foregoing, each Party shall comply with the

10

Business Associate Addendum attached to these Terms and Conditions as Exhibit A (the "Business Associate Addendum"). The Business Associate Addendum is hereby incorporated into this Agreement.

**10.    Confidentiality.**

**10.1    Definition of Confidential Information.**  Subject to the terms and conditions of this Agreement, **"Confidential Information"** shall mean all information about the disclosing Party furnished by the disclosing Party to the receiving Party, that is designated as "Confidential" or "Proprietary" (x) by stamp or legend if communicated in writing or other tangible form or (y) otherwise orally at the time of disclosure with a written confirmation within twenty (20) days describing the Confidential Information communicated orally.   MMBS' Confidential Information also includes the technology, software, hardware, products, processes, algorithms, user interfaces, website content, visual interfaces, interactive features, graphics, compilations, website elements, Written Documentation, know-how and other trade secrets, techniques, designs, inventions and other tangible or intangible technical material or information made available by MMBS to Client or any of its personnel.  **"Confidential Information"** excludes the information explicitly excluded under Section 10.3 as well as PHI as that term is defined in the Business Associate Addendum attached hereto.  Notwithstanding any term of this Section 10 to the contrary, MMBS shall be permitted to disclose any of Client's Confidential Information to the extent deemed appropriate by MMBS to provide the RCM Services.

**10.2    Confidential Information Terms.**  Except as expressly permitted in the Transaction Documents, each Party agrees to hold the other Party's Confidential Information in strict confidence; provided that MMBS may disclose Confidential Information of Client to MMBS' Representatives. Notwithstanding the above, either Party may disclose the other Party's Confidential Information upon the order of any competent court or government agency; provided that prior to disclosure, to the extent possible, the receiving Party shall inform the other Party of such order and shall reasonably cooperate with the efforts of the disclosing Party, at the disclosing Party's expense, to obtain a protective order or other action to protect the confidentiality of the Confidential Information.  It is understood and agreed that in the event of a breach of this provision damages may not be an adequate remedy and each Party shall be entitled to injunctive relief to restrain any such breach, threatened or actual without the necessity of posting a bond or other security.

Client agrees that the terms and conditions, but not the existence, of the Transaction Documents shall be treated as MMBS' Confidential Information and that no reference to the terms and conditions of the Transaction Documents or to activities pertaining thereto can be made in any manner without the prior written consent of MMBS; provided, however, that Client may disclose the terms and conditions of the Transaction Documents: (i) as required by any court or other governmental body; (ii) as otherwise required by law; (iii) to Client's legal counsel; (iv) in confidence, to accountants, banks, and financing sources and their advisors; (v) in confidence, in connection with the enforcement of this Agreement or rights under this Agreement; or (vi) in confidence, in connection with a merger or acquisition or proposed merger or acquisition, or the like.

**10.3    Non-Confidential Information.**  The term **"Confidential Information"** shall not include any information which: (i) is in the public domain at the time of disclosure or enters the public domain following disclosure through no fault of the receiving Party, (ii) the receiving Party, through competent evidence, can demonstrate knowledge prior to disclosure, (iii) is disclosed to the receiving Party by a third party legally entitled to make such disclosure without violation of any obligation of confidentiality or (iv) is independently developed by the receiving Party without reference to the disclosing Party's Confidential Information as evidenced by the written records of the receiving Party.

**10.4    De-Identified Information.** Notwithstanding anything to the contrary in the Transaction Documents, Client acknowledges and agrees that MMBS (i) may use Client Data to create de-identified

data in accordance with the HIPAA de-identification requirements; (ii) may use, create, sell, provide to third parties, and otherwise commercialize Client Data provided same has first been de-identified in accordance with HIPAA and (iii) owns all right, title and interest in such de-identified Client Data and any data, information and material created by MMBS with such de-identified Client Data.

**10.5    Feedback.**  If Client or any of its personnel inform MMBS of any errors, difficulties or other problems with any MMBS products or services, or provide any feedback or make any suggestions as to changes or modifications to MMBS' products or services, including beta or other in-development versions of such products or services (collectively, "**Feedback**"), then MMBS shall own all right, title and interest in that Feedback. Client hereby irrevocably assigns and agrees to assign all of its right, title and interest in and to the Feedback to MMBS. To the extent Client is unable to assign any of its rights in the Feedback to MMBS, Client hereby grants to MMBS a perpetual, irrevocable, worldwide, fully-paid up license to sell, offer to sell, make, have made, import, use, disclose, copy, distribute, publicly perform, publicly display, modify, create derivative works of and otherwise fully exploit the Feedback for any purpose. The Feedback shall be treated as MMBS's Confidential Information and MMBS shall have the unrestricted right to disclose the Feedback for any purpose.

**11.    Warranties & Disclaimers.**

**11.1    General Warranties.**

**11.1.1**  Client represents and warrants that it is in good standing and duly licensed, and has procured all necessary licenses, registrations, approvals, consents, and any other communications in each jurisdiction as required to enable Client to conduct its business and to perform its obligations under the Transaction Documents to which it is a party. Client further represents and warrants that it has the legal power and requisite authority to enter into the Transaction Documents to which it is a party.

**11.1.2**  Client represents, warrants and covenants that it has complied and will comply with all applicable federal, state and local laws and regulations.

**11.1.3**  CLIENT HEREBY AGREES AND ACKNOWLEDGES THAT MMBS IS IN NO WAY ACTING AS A MEDICAL PROVIDER WITH RESPECT TO ANY PATIENT OR ANY OF CLIENT'S RELATED PARTIES AND PROVIDERS. CLIENT FURTHER ACKNOWLEDGES AND AGREES THAT ANY TREATMENTS, PROCEDURES, INFORMATION, MEDICATIONS, PRODUCTS AND OTHER MATTERS REFERENCED BY ANY MMBS PRODUCT OR SERVICE ARE NOT INTENDED AS A RECOMMENDATION OR ENDORSEMENT OF ANY COURSE OF TREATMENT, PROCEDURE, INFORMATION, PRODUCT OR MEDICATION AND THAT ANY AND ALL RESPONSIBILITY FOR DIAGNOSING, TREATING OR PROVIDING ANY OTHER MEDICAL CARE TO ANY PATIENT RESTS WITH THE PHYSICIANS AND OTHER HEALTHCARE PROFESSIONALS TREATING SUCH PATIENT.

**11.1.4**  CLIENT UNDERSTANDS AND AGREES THAT ITS USE, ACCESS, DOWNLOAD, OR OTHERWISE OBTAINING INFORMATION, MATERIALS, OR DATA FROM A SOURCE OTHER THAN MMBS IS AT ITS OWN DISCRETION AND RISK AND THAT IT WILL BE SOLELY RESPONSIBLE FOR ANY DAMAGE TO ITS OR ITS PERSONNEL'S PROPERTY OR LOSS OF DATA THAT RESULTS FROM THE DOWNLOAD OR USE OF SUCH MATERIAL OR DATA.

**11.1.5**  Client represents and warrants that, to the extent required by applicable law, Client and all of its Physicians, Physician Extenders and other personnel are duly licensed by the appropriate professional board or agency in the state where Client is located and/or performs services. Client shall provide evidence of such licensing to MMBS upon reasonable request. At any time that Client, the Physicians, Physician

Extenders, or its personnel cease to be duly licensed or authorized to the extent required by applicable law, Client shall immediately so inform MMBS and such unlicensed party shall immediately cease accessing and using MMBS' products and services.

**11.2    Disclaimer of Warranties.** EXCEPT AS EXPRESSLY PROVIDED HEREIN OR IN THE TRANSACTION DOCUMENTS, MMBS MAKES NO WARRANTY OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE. MMBS HEREBY SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW.

THE ENTIRE RISK ARISING OUT OF USE OR PERFORMANCE OF THE RCM SERVICES, SOW SERVICES AND ANY OTHER PRODUCTS OR SERVICES CONTEMPLATED BY THE TRANSACTION DOCUMENTS REMAINS WITH THE CLIENT. MMBS EXPRESSLY DISCLAIMS ANY WARRANTY FOR ANY SERVICE(S), PRODUCT(S), GOOD(S), INFORMATION, DATA OR MATERIALS PROVIDED BY MMBS AS PART OF THE PRODUCTS OR SERVICES CONTEMPLATED BY THE TRANSACTION DOCUMENTS. EXCEPT AS EXPRESSLY PROVIDED HEREIN, THE MMBS IP, THE RCM SERVICES, THE SOW SERVICES AND ANY OTHER PRODUCTS OR SERVICES CONTEMPLATED BY THE TRANSACTION DOCUMENTS ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS, WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NONINFRINGEMENT. IN ADDITION, EXCEPT AS EXPRESSLY PROVIDED HEREIN, ANY THIRD-PARTY MEDIA, CONTENT, SOFTWARE, PRODUCTS, SERVICES OR APPLICATIONS MADE AVAILABLE IN CONJUNCTION WITH OR THROUGH THE RCM SERVICES, THE SOW SERVICES OR OTHER MMBS PRODUCTS OR SERVICES ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE", "WITH ALL FAULTS" BASIS AND WITHOUT WARRANTIES OR REPRESENTATIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED.

MMBS DOES NOT WARRANT OR MAKE ANY REPRESENTATION REGARDING (A) THE USE OR THE RESULTS OF THE USE OF ITS RCM SERVICES, WEBSITES OR ANY THIRD-PARTY WEBSITES IN TERMS OF CORRECTNESS, ACCURACY, RELIABILITY OR OTHERWISE, OR (B) THE ACCURACY OF DIAGNOSIS, PROCEDURE OR OTHER CODES, IMAGES, INFORMATION OR OTHER DATA PROVIDED BY THE RCM SERVICES OR SOW SERVICES OR ANY OTHER PRODUCTS OR SERVICES. MMBS IS NOT A HEALTH PLAN, HEALTH CARE PROVIDER OR PRESCRIBER.

CLIENT ACKNOWLEDGES THAT THE AGING AND AMOUNTS OF COLLECTIONS ARE SUBJECT TO NUMEROUS VARIABLES BEYOND MMBS' CONTROL. NOTHING CONTAINED IN THIS AGREEMENT SHALL BE CONSTRUED AS A GUARANTY OR WARRANTY BY MMBS THAT ANY OR ALL FEES BILLED ON CLIENT'S BEHALF (INCLUDING, WITHOUT LIMITATION, CO-PAYMENTS, DEDUCTIBLES AND COINSURANCE) SHALL BE COLLECTED OR COLLECTIBLE, IN WHOLE OR IN PART. CLIENT ACKNOWLEDGES THAT MMBS IS NOT RESPONSIBLE FOR PAYMENT OF ANY CLAIMS SUBMITTED ON CLIENT'S BEHALF UNDER ANY CIRCUMSTANCES.

MMBS DOES NOT GUARANTEE CONTINUOUS, ERROR-FREE, VIRUS-FREE OR SECURE OPERATION OF OR ACCESS TO ITS WEBSITES AND THE CONTENTS THEREOF, SERVICE ELEMENTS OR RELATED SOFTWARE. CLIENT ASSUMES THE ENTIRE RISK WITH RESPECT TO THE PERFORMANCE AND RESULTS IN CONNECTION WITH ANY PRODUCTS AND SERVICES PROVIDED HEREUNDER. MMBS SHALL HAVE NO LIABILITY FOR ANY

COMMUNICATION BETWEEN MMBS AND THE PATIENTS OF CLIENT.

CLIENT ACKNOWLEDGES THAT MMBS MAY USE THIRD PARTY WEBSITES, THIRD PARTY HELP DESK SYSTEMS AND OTHER THIRD-PARTY SERVICES TO PROVIDE CERTAIN SUPPORT SERVICES AND ONLINE FORUMS TO CLIENT. CLIENT UNDERSTANDS THAT SUCH THIRD-PARTY WEBSITES, THIRD PARTY HELP DESK SYSTEMS, ONLINE FORUMS AND OTHER THIRD-PARTY SERVICES MAY NOT MEET THE REQUIREMENTS FOR THE PROTECTION OF PROTECTED HEALTH INFORMATION (AS DEFINED IN THE BUSINESS ASSOCIATE ADDENDUM) SET FORTH IN APPLICABLE LAWS AND REGULATIONS, INCLUDING, WITHOUT LIMITATION, HIPAA AND THE HEALTH INFORMATION TECHNOLOGY FOR ECONOMIC AND CLINICAL HEALTH ACT. CLIENT AGREES THAT IT SHALL NOT, AND IT SHALL CAUSE ITS PERSONNEL TO NOT, SUBMIT ANY PROTECTED HEALTH INFORMATION (A) TO MMBS OUTSIDE OF THE MODMED SOFTWARE, INCLUDING BUT NOT LIMITED TO EMAIL TRANSMISSIONS, SUBMISSIONS TO ANY ONLINE FORUM MADE AVAILABLE BY MMBS TO ITS CUSTOMERS, AND SUBMISSIONS THROUGH ANY SUPPORT WEBSITE, PORTAL, OR ONLINE HELP DESK OR SIMILAR SERVICE MADE AVAILABLE BY MMBS OR (B) DIRECTLY TO ANY THIRD PARTY INVOLVED IN THE PROVISION OF AN ONLINE FORUM, EMAIL, SUPPORT WEBSITE, ONLINE HELP DESK OR OTHER SERVICE DESCRIBED IN (A), ABOVE. REPEATED VIOLATIONS OF THIS REPRESENTATION BY CLIENT WILL ENTITLE MMBS, IN MMBS' SOLE DISCRETION, TO RESTRICT CLIENT'S ACCESS TO SUCH THIRD-PARTY SERVICES AND/OR TAKE ANY OTHER ACTIONS REQUIRED OR PERMITTED BY THE BUSINESS ASSOCIATE ADDENDUM IN CONNECTION WITH SUCH VIOLATIONS.

**11.3    Limitations by Applicable Law.** THE LIMITATIONS OR EXCLUSIONS OF WARRANTIES, REMEDIES, OR LIABILITY CONTAINED IN THE TRANSACTION DOCUMENTS APPLY TO CLIENT TO THE FULLEST EXTENT SUCH LIMITATIONS OR EXCLUSIONS ARE PERMITTED UNDER THE LAWS OF THE JURISDICTION IN WHICH CLIENT AND ITS PERSONNEL ARE LOCATED.

**11.4    Basis of the Bargain.** CLIENT ACKNOWLEDGES AND AGREES THAT MMBS HAS OFFERED ITS PRODUCTS AND SERVICES AND ENTERED INTO THE TRANSACTION DOCUMENTS TO WHICH IT IS A PARTY IN RELIANCE UPON THE WARRANTY DISCLAIMERS AND THE LIMITATIONS OF LIABILITY SET FORTH HEREIN, THAT THE WARRANTY DISCLAIMERS AND THE LIMITATIONS OF LIABILITY SET FORTH HEREIN REFLECT A REASONABLE AND FAIR ALLOCATION OF RISK BETWEEN CLIENT AND MMBS, AND THAT THE WARRANTY DISCLAIMERS AND THE LIMITATIONS OF LIABILITY SET FORTH HEREIN FORM AN ESSENTIAL BASIS OF THE BARGAIN BETWEEN CLIENT AND MMBS. CLIENT ACKNOWLEDGES AND AGREES THAT MMBS WOULD NOT BE ABLE TO PROVIDE THE RCM SERVICES OR SOW SERVICES TO CLIENT ON AN ECONOMICALLY REASONABLE BASIS WITHOUT THESE LIMITATIONS.

**12.    Limitation of Liability; Indemnification.**

**12.1    Limitation of Liability.** IN NO EVENT SHALL MMBS' AND ITS PRESENT AND FORMER SUBSIDIARIES', AFFILIATES', PARENTS', DIRECTORS', OFFICERS', EMPLOYEES', AND AGENTS' AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THE RCM SERVICES, THE SOW SERVICES, ANY OTHER PRODUCTS OR SERVICES AND/OR ANY OF THE TRANSACTION DOCUMENTS, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR UNDER ANY OTHER THEORY OF LIABILITY, EXCEED THE FEES ACTUALLY PAID BY

14

THE CLIENT TO MMBS UNDER THIS AGREEMENT DURING THE THREE (3) MONTH PERIOD IMMEDIATELY PRECEDING THE DATE THE CAUSE OF ACTION AROSE.

**12.2    Exclusion of Consequential and Related Damages.**  IN NO EVENT SHALL MMBS OR ITS PRESENT AND FORMER SUBSIDIARIES, AFFILIATES, PARENTS, DIRECTORS, OFFICERS, EMPLOYEES OR AGENTS HAVE ANY LIABILITY TO CLIENT, ITS PERSONNEL OR ANY THIRD PARTY FOR ANY LOST PROFITS, PAYER RECOUPMENTS OF REIMBURSEMENTS, REFUNDS TO PAYERS OR OTHER LOST REIMBURSEMENTS, LOSS OF DATA, LOSS OF USE, COSTS OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES, OR FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES HOWEVER CAUSED AND, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR UNDER ANY OTHER THEORY OF LIABILITY WHETHER OR NOT MMBS HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.

**12.3    Limitation of Action.**  No action (regardless of form) arising out of the Transaction Documents may be commenced by Client against MMBS more than two (2) years after the cause of action arose.

**12.4    Indemnification.**  Client shall indemnify and hold harmless MMBS and MMBS' Affiliates and each of their respective officers, directors, employees and agents, from and against any and all damages, liabilities, penalties, interest, fines, losses, costs and expenses (including reasonable attorneys' fees and expenses), arising, directly or indirectly, out of or relating to any claim or allegation based on (i) a breach of any of the Transaction Documents by Client or any of its personnel, (ii) the accuracy, quality, integrity, legality, reliability or appropriateness of any Client Data or other content or data provided by Client or its personnel to MMBS, (iii) violation of any applicable law, rule or regulation by Client or any of its personnel, (v) the diagnosis and/or treatment of any of Client's Patients, (vi) the submission of any false or fraudulent claim to any Payer, (vii) Insurance Eligibility Verification, Appointment Reminder Services or Coding Activities and/or (viii) the negligent acts or willful misconduct of Client or its personnel.

**12.5    Sole Responsibility.**  *Client agrees that the sole and exclusive responsibility for any medical decisions or actions with respect to a Patient's medical care and for determining the accuracy, completeness or appropriateness of any billing, clinical, coding, diagnostic, medical or other information provided by the RCM Services, the SOW Services or any other products or services provided by MMBS or any of its Affiliates resides solely with the Physicians, Physician Extenders or other professionals treating such Patient.  MMBS does not assume any responsibility for how such information is used. Client acknowledges and agrees that neither the RCM Services, the SOW Services nor any other products or services provided by MMBS or any of its Affiliates "recommend," "suggest," or "advise" proper prescribing or other treatment decisions and that the responsibility for the medical treatment, and any associated decisions regarding billing for medical services, rests with the Physicians, the Physician Extenders or other professionals treating such Patient and revolves around such health care provider's judgment and such health care provider's analysis of the Patient's condition.*

**13.    Termination.**

**13.1    Termination.**

**13.1.1  By Client.**  Client may terminate this Agreement: (i) in the event of a material breach of this Agreement by MMBS, provided, that, Client provides written notice of such material breach to MMBS and such breach remains uncured thirty (30) days after MMBS' receipt of such notice; or (ii) in accordance with the terms of the Business Associate Addendum.

**13.1.2  By MMBS.** MMBS may terminate any of the Transaction Documents: (i) as set forth in Sections 4.2 and 8 of these Terms and Conditions; (ii) in accordance with the terms of the Business Associate Addendum, (iii) immediately if Client becomes insolvent or unable to pay its debts as they become due, or the subject of a petition in bankruptcy or any proceeding relating to insolvency, receivership, liquidation or assignment for the benefit of creditors, (iv) if Client defaults on any of its payment obligations under any of the Transaction Documents and such payment default is not cured within ten (10) days after receiving written notice of such default from MMBS, (v) immediately if MMBS provides Client of notice of any of the following issues: (a) if any of the representations or warranties by Client contained in this Agreement are false or incorrect when made or hereafter become false or incorrect, (b) in the event MMBS becomes aware that Client has failed to address any overpayment or denial of payment by any Payer within thirty (30) days after notification of such overpayment or denial of payment has been provided to Client, (c) in the event that Client shall have failed to complete inaccurate or incomplete claim forms upon request by MMBS within thirty (30) days of the date requested by MMBS, (d) in the event Client engages in activities that result, or would result or necessitate, material changes or modifications to the procedures or activities by which MMBS delivers the RCM Service, or (e) Client submits inaccurate or inappropriate claims for billing or fails to provide documentation or information sufficient in MMBS' determination to cure any such inaccuracy or inappropriateness, and fail to correct any such inaccurate or inappropriate claim within thirty (30) days after notification by MMBS to Client or (vi) immediately upon the termination of any authorization of Client to use Modernizing Medicine's electronic medical records or practice management software. Without limiting the foregoing, following the expiration of the Initial Term, MMBS may terminate any of the Transaction Documents by providing at least thirty (30) days prior written notice to Client of such termination.

**13.1.3  Changes.** If, during the Term, any federal, state or local law or regulation shall be enacted, or any decree of any court or any other administrative agency shall be entered or other condition shall arise, which, in the reasonable opinion of MMBS, would result in a material change in the cost of providing RCM Services to Client, MMBS and Client shall promptly enter into negotiations to revise the RCM Fees to provide MMBS with appropriate compensation under this Agreement. If such negotiations fail to result in an agreement between MMBS and Client as to amended fees within thirty (30) days after Client receives notice of the event giving rise to Client's duty to negotiate set forth above, then MMBS shall have the right to terminate this Agreement upon thirty (30) days prior written notice to Client.

**13.2    Outstanding Fees.** Termination shall not relieve Client of the obligation to pay any fees or expenses accrued or payable to MMBS prior to the effective date of termination or prior to the expiration of The Ninety Day Wind Down Period (as defined below).

**13.3    Effect of Termination.**

**13.3.1  Generally.** Termination of this Agreement for any reason shall not affect MMBS' right to recover damages for events occurring before termination. Upon termination or expiration of this Agreement for any reason, Client shall not use or access, directly or indirectly, any MMBS IP. If Client has any copies of any MMBS IP, Client shall either destroy or return to MMBS all such copies along with a certificate signed by Client that all such copies have been either destroyed or returned, respectively, and that no copy or any part of any MMBS IP has been retained by Client in any form. In the event either Party provides written notice of termination of any of the Transaction Documents to the other Party in accordance with the applicable Transaction Document, MMBS shall have the right to automatically charge Client's bank, credit card or other account designated under Section 3.7, an amount equal to the sum of any outstanding RCM Fees, SOW Fees, SOW Expenses or other amounts owed to MMBS plus, to be held as a deposit, an amount reasonably estimated by MMBS to cover any Fees, RCM Fees, SOW Fees, SOW Expenses or other amounts, which are anticipated to be due and owing for the period commencing on the date of such notice through the termination date (which deposit shall be credited back to Client subsequent to termination to

16

the extent the actual Fees, RCM Fees, SOW Fees, SOW Expenses and other amounts due and owing for such period are less than the amount of such deposit. Client shall not, under any circumstances: (i) revoke any authorization to charge Client's bank, credit card or other account for any fees incurred or to reasonably anticipated to be incurred during the above-referenced termination period or (ii) contest any charges to Client's bank, credit card or other account, which are made by MMBS in accordance with any of the Transaction Documents.

**13.3.2  RCM Service Wind-Down.**  In the event of the expiration or termination of this Agreement for any reason, MMBS may, in its sole discretion, continue to provide collection services for previously billed claims until the ninetieth (90th) day following the effective termination or expiration date (**"The Ninety Day Wind Down Period"**).  MMBS shall be entitled to receive payment of its RCM Fees on all collections received for a period of ninety (90) days after the date of termination or expiration of this Agreement. Payment shall be made to MMBS on a monthly basis and each payment shall be due ten (10) days after the end of each month following the date of the termination or expiration of this Agreement.

**13.4  Survival.** Sections 1, 3.4, 3.5, 3.9, 3.11, 3.12, 6.5, 6.6, 6.7, 6.8, 6.9, 7, 8, 9, 10, 11, 12, 13 and 14 shall survive the expiration or termination of this Agreement for any reason.

## 14.  General Provisions.

**14.1  Relationship of the Parties.**  None of the Transaction Documents create a partnership, franchise, joint venture, agency, fiduciary, or employment relationship between the Parties and the status of the Parties shall be independent parties to a contractual arrangement. Neither Party shall have the authority to bind the other Party by contract or otherwise.

**14.2  Benefit to Others.**  The representations, warranties, covenants and agreements contained in the Transaction Documents are for the sole benefit of the Parties and their respective successors and permitted assigns, and they are not to be construed as conferring any rights on any other Persons, including, but not limited to, third party rights for Client's Patients.

**14.3  Notices.**  Any notice required by this Agreement or given in connection with therewith, shall be in writing and shall be given (i) if to MMBS, to Modernizing Medicine Billing Services, LLC at the attention of the General Counsel, to MMBS's address set forth in this Agreement or such other address as may be provided in writing from time to time, by personal delivery or by certified mail, postage prepaid, or recognized overnight delivery services with proof of delivery and (ii) if to Client, to the Client's address (or email address) set forth in this Agreement or such other address (or email address) as may be provided in writing from time to time by email or by personal delivery or by certified mail, postage prepaid, or recognized overnight delivery services with proof of delivery.

**14.4  Waiver and Cumulative Remedies.**  No failure or delay by either Party in exercising any right under this Agreement shall constitute a waiver of that right.  Other than as expressly stated herein, the remedies provided herein are in addition to, and not exclusive of, any other remedies of a Party at law or in equity.

**14.5  Force Majeure.**  MMBS shall not be liable for failure or delay in performing its obligations hereunder if such failure or delay is due to a force majeure event or other circumstances beyond its reasonable control, including, without limitation, acts of any governmental body, war, cyber war or attack, terrorism, insurrection, sabotage, embargo, fire, flood, tropical storm, earthquake, tornado, hurricane, labor disturbance, interruption of or delay in transportation, unavailability of third party services, failure of third party software or services or inability to obtain raw materials, supplies or power used in or equipment

17

needed for provision of the RCM Services, the SOW Services or any other products or services contemplated by any of the Transaction Documents (each, a "**Force Majeure Event**").

**14.6     Inspection and Audit Rights.** MMBS shall have the right to audit or inspect and copy the books and records of Client to ensure compliance with Client's obligations under this Agreement. In the event of any investigation, proceeding or litigation involving any governmental entity, Client shall make available to MMBS for inspection and copy any clinical documentation reasonably necessary for MMBS to respond, participate or defend itself in any such investigation, proceeding or litigation.

**14.7     Severability.** If any provision of this Agreement is held by a court or arbitrator of competent jurisdiction to be unenforceable, such provision shall be changed by the court or by the arbitrator and interpreted so as best to accomplish the objectives of the original provision to the fullest extent permitted by law, and the remaining provisions of this Agreement shall remain in effect, unless the modification or severance of any provision has a material adverse effect on a Party, in which case such Party may terminate this Agreement by notice to the other Party.

**14.8     Assignment.** Neither Party may assign any of its rights or obligations hereunder or under any other Transaction Document, whether by operation of law or otherwise, without the prior express written consent of the other Party. Notwithstanding the foregoing, MMBS shall be permitted to assign any of the Transaction Documents without the prior written consent of Client: (i) to an Affiliate, parent company or subsidiary or (ii) in connection with a merger, acquisition, corporate reorganization, or sale of all or substantially all of its assets. Any attempt by a Party to assign its rights or obligations under any of the Transaction Documents in breach of this Section 14.8 shall be void and of no effect. Subject to the foregoing, each of the Transaction Documents shall bind and inure to the benefit of the Parties, their respective successors and permitted assigns.

**14.9     Governing Law.** Except as otherwise provided herein, each of the Transaction Documents shall be governed by, and construed in accordance with, the laws of the State of California, without regard to its conflict of laws provisions.

**14.10     Venue.** The federal courts of the United States in and for the Northern District of California and the state courts of the State of California located in Placer County, California shall have exclusive jurisdiction to adjudicate any dispute arising out of or relating to any of the Transaction Documents. Each Party hereby consents to the jurisdiction of such courts and waives any right it may otherwise have to challenge the appropriateness of such forums, whether on the basis of the doctrine of forum non conveniens or otherwise.

**14.11     Enforcement Costs.** If any legal action or other proceeding is brought for the enforcement or interpretation of any of the Transaction Documents, or because of an alleged dispute, breach, default or misrepresentation in connection with any provision of the Transaction Documents, the prevailing Party shall be entitled to recover reasonable attorneys' fees, court costs and all expenses incurred in that action or proceeding and at all levels of trial and appeal, in addition to any other relief to which such Party may be entitled.

**14.12     Third Party Arrangements.**     Client acknowledges and agrees that it shall be solely responsible for performance of all of its duties, obligations, and covenants arising under the Transaction Documents. In the event that Client enters into an arrangement with any other individual or entity to fulfill all or any part of its payment obligations pursuant to the Transaction Documents ("**third party arrangement**"), Client represents and warrants that any such third-party arrangement shall not affect the obligations of Client to MMBS pursuant to the Transaction Documents. Client further represents and warrants that any such third-party arrangement shall be in compliance at all times with all applicable federal, state, and local

laws, regulations and ordinances including, without limitation, the Medicare and Medicaid Anti-Fraud and Abuse Amendments to the Social Security Act and the Stark Law. Client acknowledges and agrees that MMBS is under no obligation to accept any payment from any third party, which is unsatisfactory to MMBS in its good faith business judgment. The Client agrees that it shall be responsible for promptly reimbursing MMBS for all fees required by the American Medical Association or other similar organization to be paid by MMBS to such organization relating to the Client and its Patients, employees, representatives, consultants, contractors or agents use of the RCM Services.

**14.13   Entire Agreement and Construction.**   The Transaction Documents constitute the entire agreement between the Parties as to their subject matter, and supersede all previous and contemporaneous agreements, proposals or representations, written or oral, concerning such subject matter.   Except as otherwise set forth therein, no modification, amendment, or waiver of any provision of the Transaction Documents shall be effective unless in writing and signed by the Party against whom the modification, amendment, or waiver is to be asserted.   Under no circumstances shall the terms of any purchase order submitted by Client to MMBS be deemed binding upon MMBS.

**14.14   Counterparts.**   Each of the Transaction Documents requiring execution by a Party hereto may be executed in one or more counterparts, which may be delivered by fax or other electronic transmission, including email, each of which shall be deemed an original and which taken together shall form one legal instrument.

**14.15   Headings.**   Headings used in each of the Transaction Documents are provided for convenience only and shall not be used to provide meaning or intent.

**14.16   Due Execution.** Client acknowledges that MMBS shall not be deemed bound by this Agreement, any Addendum thereto, any Statement of Work thereunder or any other Transaction Documents requiring execution unless and until the same shall have been duly executed by an authorized representative of MMBS and Client.

[Remainder of page left intentionally blank]

**Exhibit A**
**Business Associate Addendum**

**I.    GENERAL PROVISIONS**

**Section 1.1.    Applicability.** This Business Associate Addendum (this "**Addendum**") relates to Protected Health Information received by MMBS from or on behalf of the Client ("**PHI**").

**Section 1.2.    HIPAA Amendments.** The Parties acknowledge and agree that the Health Information Technology for Economic and Clinical Health Act and its implementing regulations impose requirements with respect to privacy, security and breach notification applicable to Business Associates (collectively, the "**HITECH BA Provisions**"). The HITECH BA Provisions and any other future amendments to HIPAA affecting Business Associate Agreements are hereby incorporated by reference into this Addendum as if set forth in this Addendum in their entirety, effective on the later of the effective date of this Addendum or such subsequent date as may be specified by HIPAA.

**Section 1.3.    Regulatory References.** A reference in this Addendum to a section in HIPAA means the section as it may be amended from time-to-time. Capitalized terms used in this Addendum without definition shall have the meanings given to them by HIPAA or by this Agreement, as applicable.

**II.    OBLIGATIONS OF MMBS**

**Section 2.1.    Use and Disclosure of PHI.** MMBS may use and disclose PHI as permitted or required under this Agreement (including this Addendum) or as Required by Law, but shall not otherwise use or disclose PHI. MMBS shall not use or disclose PHI received from the Client in any manner that would constitute a violation of HIPAA if so used or disclosed by the Client (except as set forth in Sections 2.1(a), (b) and (c) of this Addendum). To the extent MMBS carries out any of the Client's obligations under the HIPAA Privacy Rule, MMBS shall comply with the requirements of the HIPAA Privacy Rule that apply to the Client in the performance of such obligations. Without limiting the generality of the foregoing, MMBS is permitted to use or disclose PHI as set forth below:

(a) MMBS may use PHI internally for MMBS' proper management and administrative services or to carry out its legal responsibilities;

(b) MMBS may disclose PHI to a third party for MMBS' proper management and administration, provided that the disclosure is Required by Law or MMBS obtains reasonable assurances from the third party to whom the PHI is to be disclosed that the third party will (1) protect the confidentiality of the PHI, (2) only use or further disclose the PHI as Required by Law or for the purpose for which the PHI was disclosed to the third party and (3) notify MMBS of any instances of which the person is aware in which the confidentiality of the PHI has been breached;

(c) MMBS may use PHI to provide Data Aggregation services as defined by HIPAA;

(d) MMBS may use PHI to create de-identified health information in accordance with the HIPAA de-identification requirements. Without limiting any other rights of MMBS under this Agreement, MMBS may use, create, sell, disclose to third parties and otherwise commercialize de-identified health information for any purposes not prohibited by law. MMBS owns all right, title and interest in such de-identified health information and any data, information and material created

20

by MMBS with such de-identified health information. For the avoidance of doubt, the second and third sentences of this Section 2.1(d) shall survive the expiration or earlier termination of this Agreement;

(e) MMBS may use and disclose PHI to develop, create, improve, update or otherwise change currently contracted for or new products and services for Client and other customers of MMBS;

(f) MMBS may use and disclose PHI for purposes of obtaining an authorization to use and disclose PHI or any other permission from an individual; and

(g) MMBS may use and disclose PHI for Research purposes as permitted by applicable law.

**Section 2.2.    Safeguards.** MMBS shall use reasonable and appropriate safeguards to prevent the use or disclosure of PHI except as otherwise permitted or required by this Addendum. In addition, MMBS shall implement Administrative Safeguards, Physical Safeguards and Technical Safeguards that reasonably and appropriately protect the Confidentiality, Integrity and Availability of PHI transmitted or maintained in Electronic Media ("**EPHI**") that it creates, receives, maintains or transmits on behalf of the Client. MMBS shall comply with the HIPAA Security Rule with respect to EPHI.

**Section 2.3.    Minimum Necessary Standard.** To the extent required by the "minimum necessary" requirements of HIPAA, MMBS shall only request, use and disclose the minimum amount of PHI necessary to accomplish the purpose of the request, use or disclosure.

**Section 2.4.    Mitigation.** MMBS shall take reasonable steps to mitigate, to the extent practicable, any harmful effect (that is known to MMBS) of a use or disclosure of PHI by MMBS in violation of this Addendum.

**Section 2.5.    Subcontractors.** MMBS shall enter into a written agreement meeting the requirements of 45 C.F.R. §§ 164.504(e) and 164.314(a)(2) with each Subcontractor (including, without limitation, a Subcontractor that is an agent under applicable law) that creates, receives, maintains or transmits PHI on behalf of MMBS. MMBS shall ensure that the written agreement with each Subcontractor obligates the Subcontractor to comply with restrictions and conditions that are at least as restrictive as the restrictions and conditions that apply to MMBS under this Addendum.

**Section 2.6.    Reporting Requirements.**

(a) If MMBS becomes aware of a use or disclosure of PHI in violation of this Agreement by MMBS or by a third party to which MMBS disclosed PHI, MMBS shall report any such use or disclosure to the Client without unreasonable delay.

(b) MMBS shall report any Security Incident involving EPHI that is not an Unsuccessful Security Incident (as defined below) of which MMBS becomes aware without unreasonable delay. MMBS hereby notifies Client of pings and other broadcast attacks on a firewall, denial of service attacks, port scans, unsuccessful login attempts, interception of encrypted information where the encryption key is not compromised, and other Unsuccessful Security Incidents. MMBS will provide additional information about Unsuccessful Security Incidents on a reasonable basis, orally or in writing, if requested by Client. If the HIPAA security regulations are amended to remove the requirement to report Unsuccessful Security Incidents, the requirement hereunder to report

21

Unsuccessful Security Incidents will no longer apply as of the effective date of the amendment. **"Unsuccessful Security Incident"** means a Security Incident that does not involve unauthorized access, use, disclosure, modification or destruction of EPHI or interference with an Information System in a manner that poses a material threat to the Confidentiality, Integrity, or Availability of the EPHI.

(c)  MMBS shall, following the discovery of a Breach of Unsecured PHI, notify the Client of the Breach in accordance with 45 C.F.R. § 164.410 without unreasonable delay and in no case later than sixty (60) days after discovery of the Breach.

**Section 2.7.    Access to Information**. MMBS shall make available PHI in the ModMed Software to Client in accordance with this Agreement for so long as MMBS maintains the PHI in a Designated Record Set. If MMBS receives a request for access to PHI directly from an Individual, MMBS shall forward such request to Client within ten (10) business days. Client shall have the sole responsibility for determining whether to approve a request for access to PHI and to provide such access to the Individual.

**Section 2.8.    Availability of PHI for Amendment**. MMBS shall make available PHI in the ModMed Software to Client for amendment, and incorporate any such amendments in the PHI (for so long as MMBS maintains such information in the Designated Record Set), in accordance with this Agreement and as required by 45 C.F.R. § 164.526. If MMBS receives a request for amendment to PHI directly from an Individual, MMBS shall forward such request to Client within ten (10) business days. Client shall have the sole responsibility for determining whether to approve an amendment to PHI and to make such amendment.

**Section 2.9.    Accounting of Disclosures**. Within thirty (30) business days of written notice by Client to MMBS that it has received a request for an accounting of disclosures of PHI (other than disclosures to which an exception to the accounting requirement applies), MMBS shall make available to Client such information as is in MMBS' possession and is required for Client to make the accounting required by 45 C.F.R. § 164.528. If MMBS receives a request for an accounting directly from an Individual, MMBS shall forward such request to Client within seven (7) business days. Client shall have the sole responsibility for providing an accounting to the Individual.

**Section 2.10.    Availability of Books and Records**. Following reasonable advance written notice, MMBS shall make its internal practices, books and records relating to the use and disclosure of PHI received from, or created or received by MMBS on behalf of, Client available to the Secretary for purposes of determining Client's compliance with HIPAA.

III.    **OBLIGATIONS OF THE CLIENT**

**Section 3.1.    Permissible Requests**. The Client shall not request MMBS to use or disclose PHI in any manner that would not be permissible under HIPAA if done by Client.

**Section 3.2.    Minimum Necessary Information**. When Client discloses PHI to MMBS, Client shall provide the minimum amount of PHI necessary for the accomplishment of Client's purpose.

**Section 3.3.    Appropriate Use of PHI**. Client and its employees, representatives, consultants, contractors and agents shall not submit any Protected Health Information to MMBS (A) outside of the ModMed Software, including but not limited to submissions to any online forum made available by MMBS to its customers, email transmissions, and submissions through any support

22

website, portal, or online help desk or similar service; or (B) directly to any third party involved in the provision of an online forum, email, support website, online help desk or other service described in (A), above.

Section 3.4.    **Permissions; Restrictions.** Client warrants that it has obtained and will obtain any consent, authorization and/or other legal permission required under HIPAA and other applicable law for the disclosure of PHI to MMBS. Client shall notify MMBS of any changes in, or revocation of, the permission by an Individual to use or disclose his or her PHI, to the extent that such changes may affect MMBS' use or disclosure of PHI. Client shall not agree to any restriction on the use or disclosure of PHI under 45 CFR § 164.522 that restricts MMBS' use or disclosure of PHI under this Agreement (including under this Addendum) unless such restriction is Required By Law or MMBS grants its written consent.

Section 3.5.    **Notice of Privacy Practices.** Except as Required By Law, with MMBS' consent or as set forth in this Agreement, Client shall not include any limitation in Client's notice of privacy practices that limits MMBS' use or disclosure of PHI under this Agreement (including this Addendum).

IV.    **TERMINATION OF THIS AGREEMENT**

Section 4.1.    **Addendum Term.** Without limiting any other term of this Agreement (including this Addendum), this Addendum shall continue in full force and effect for so long as MMBS maintains any PHI.

Section 4.2.    **Termination Upon Breach of this Addendum.** Any other provision of this Agreement notwithstanding, this Agreement may be terminated by either Party (the "Non-Breaching Party") upon ninety (90) days written notice to the other Party (the "**Breaching Party**") in the event that the Breaching Party materially breaches this Addendum in any material respect and such breach is not cured within such ninety (90) day period. Any determination of whether a material breach has been cured shall be made by MMBS in its sole discretion.

Section 4.3.    **Return or Destruction of PHI upon Termination.** Upon termination of this Agreement, MMBS shall return or destroy all PHI received from Client or created or received by MMBS on behalf of Client and which MMBS still maintains as PHI. Notwithstanding the foregoing, to the extent that MMBS determines, in its sole discretion, that it is not feasible to return or destroy such PHI, this Addendum (including, without limitation, Section 2.1(d) of this Addendum) shall survive termination of this Agreement and such PHI shall be used or disclosed solely for such purpose or purposes which prevented the return or destruction of such PHI.